# URIE *v.* THOMPSON, TRUSTEE.

No. 129. Argued January 3, 1949.—Decided May 31, 1949.

164

*Guy W. Green* argued the cause for petitioner. With him on the brief was *Louis N. Wolf*.

*Lyman J. Bishop* argued the cause for respondent. With him on the brief were *Thomas J. Cole* and *D. C. Chastain*.

*Daniel W. Knowlton* and *J. Stanley Payne* filed a brief for the Interstate Commerce Commission as *amicus curiae*.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The primary question is whether the coverage of the Federal Employers' Liability Act and the Boiler Inspection Act [1] includes injuries in the nature of occupational disease, here silicosis, or is confined exclusively to injuries inflicted by accident. After having been twice before the Supreme Court of Missouri, the case is here on certiorari, 335 U. S. 809, for review of its final decision on the second appeal that recovery may not be had for other than accidental injuries. A statement of the course taken by the proceedings in the state courts, as well as of the facts, becomes necessary for resolving the issues presented.

In 1941 petitioner Tom Urie filed suit under the Federal Employers' Liability Act against respondent Thompson, trustee of the Missouri Pacific Railroad. According to petitioner's allegations, he had been employed as a fireman on steam locomotives of the interstate Missouri Pacific for roughly thirty years. In 1940 he had been forced to cease work by a pulmonary disease diagnosed

---

[1] Respectively 45 U. S. C. § 51 *et seq.* and 45 U. S. C. § 23 *et seq.*

as silicosis.. This permanently disabling affliction had been caused by continuous inhalation of silica dust blown or sucked into the cabs of the locomotives on which he had worked. The injurious concentration of silica dust in the air breathed by petitioner arose from the railroad's use in its locomotives' sanding boxes of sand materials containing 80 to 90 per cent of silica or silicon dioxide and the emission by the locomotives' faultily adjusted "sanders"[2] of such sand materials in excessive amounts beyond those needed to provide traction for locomotive wheels. Respondent Thompson, trustee of the railroad since 1933, "knew, or by the exercise of due care should have known," of the danger of silicosis arising from the conditions of petitioner's employment.[3]

The trial court sustained respondent's demurrer to the complaint. On appeal the Missouri Supreme Court held that the action could not be maintained by virtue of the Federal Employers' Liability Act alone, for the reason that respondent could not have "anticipated plaintiff's injury, and . . . therefore . . . the petition does not state facts sufficient to constitute a cause of action for negligence under the Federal Employers Liability Act." 352 Mo. 211, 219. The court felt, however, that the claimed malfunctioning of the locomotives' sanders was in substance an allegation of breach of § 2 of the Boiler Inspection Act and that, since proof of breach of the latter Act would support a recovery under the Federal

---

[2] "Sander" is, colloquially, the name given by railroad men to the entire apparatus appurtenant to a locomotive which stores sand and pipes it to the rails, as needed, to provide traction. The apparatus is mandatory equipment in interstate commerce, I. C. C. Rule 120, 49 C. F. R. § 91.120; I. C. C. Rule 235, 49 C. F. R. § 91.235. For succinct descriptions of a compressed-air powered sanding apparatus, see the successive opinions in *Anderson* v. *Baltimore & O. R. Co.*, 89 F. 2d 629 and 96 F. 2d 796.

[3] See note 9.

Employers' Liability Act without regard to respondent's negligence, *Lilly* v. *Grand Trunk R. Co.*, 317 U. S. 481, 485–486, petitioner had stated a cause of action. Furthermore, the court held that the Federal Employers' Liability Act's three-year statute of limitations, 45 U. S. C. § 56, did not bar petitioner's claim since his "cause of action accrued in May, 1940, when he became incapacitated . . . ." 352 Mo. at 222. Accordingly the court reversed the judgment and remanded the cause for trial.

On remand petitioner amended his complaint to charge specifically violations of the Boiler Inspection Act. Section 2 of that Act, as amended, makes it "unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb . . . ." 45 U. S. C. § 23.[4] The violations alleged were (1) that the sanders were broken or faultily adjusted so as to release too much sand and (2) that the locomotive decks and cabs were in a bad state of repair,

[4] The section continues, "and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time . . . and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." 45 U. S. C. § 23, 36 Stat. 913, 38 Stat. 1192, 43 Stat. 659.

Section 2 was first enacted in 1911 to cover the locomotive boiler and its appurtenances, 36 Stat. 913. It was broadened in 1915 to include the entire locomotive and tender, 38 Stat. 1192; and see the 1924 amendment. 43 Stat. 659.

The second amended complaint, to which the demurrer involved in the first appeal applied, did not mention specifically either the Federal Employers' Liability Act or the Boiler Inspection Act, but set forth facts generally from which the state supreme court's conclusions concerning the applicability of those acts were drawn,

admitting dust through various cracks and openings in the cab's floor and elsewhere which ought to have been sealed off.

.The case was tried to a jury, under instructions that negligence was not in issue and that petitioner should prevail if he proved that he had contracted silicosis by reason of respondent's breach of an "absolute and continuing duty to have such locomotive engines and all their parts and appurtenances thereof, in proper condition and safe to operate . . . without unnecessary peril to the life of Tom Urie . . . ." The jury found for petitioner in the amount of $30,000.

Upon respondent's appeal the Missouri Supreme Court reversed the judgment entered on this verdict. 357 Mo. 738. Noting that on the former review it did not "treat with a contention that 'silicosis' is not an evil at which the Act is aimed," *id.* at 746, the court concluded that the Boiler Inspection Act "is aimed at promoting safety from accidental injury, as distinguished from injury due to the gradual inhalation of harmful dusts." *Id.* at 749. It was to review the state supreme court's successive constructions of the Federal Employers' Liability and Boiler Inspection Acts that our writ was issued.

## I.

Two preliminary contentions first engage our attention. We are met at the outset by the question whether, without regard to the legal sufficiency of petitioner's claim under either Act, that claim is barred as to both Acts by operation of the Federal Employers' Liability Act's statute of limitations.

Urie filed suit on November 25, 1941. Under the terms of the then prevailing three -year statute of limitations,[5]

---

[5] 45 U. S. C. § 56. The former two-year statute of limitations, 35 Stat. 66, was lengthened to three years by the 1939 amendment. 53 Stat. 1404.

the court could not entertain the claim if Urie's "cause of action accrued" before November 25, 1938. Respondent contends that Urie, having been exposed to silica dust since approximately 1910, must unwittingly have contracted silicosis long before 1938, and hence that his "cause of action" must be deemed to have "accrued" longer than three years before the institution of this action. Alternatively it may be argued that each inhalation of silica dust was a separate tort giving rise to a fresh "cause of action," and that Urie is therefore limited to a claim for inhalations between November 25, 1938, and the spring day in 1940 when he became incapacitated.[6]

In our view, however, neither of the outlined constructions of the statute of limitations can be sustained. For, if we assume that Congress intended to include occupational diseases in the category of injuries compensable under the Federal Employers' Liability and Boiler Inspection Acts, such mechanical analysis of the "accrual" of petitioner's injury—whether breath by breath, or at one unrecorded moment in the progress of the disease—can only serve to thwart the congressional purpose.

If Urie were held barred from prosecuting this action because he must be said, as a matter of law, to have contracted silicosis prior to November 25, 1938, it would be clear that the federal legislation afforded Urie only a delusive remedy. It would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability.

---

[6] Cf. *Pieczonka v. Pullman Co.*, 89 F. 2d 353, 356–357.

Nor can we accept the theory that each intake of dusty breath is a fresh "cause of action." In the present case, for example, application of such a rule would, arguably, limit petitioner's damages to that aggravation of his progressive injury traceable to the last eighteen months of his employment. Moreover petitioner would have been wholly barred from suit had he left the railroad, or merely been transferred to work involving no exposure to silica dust, more than three years before discovering the disease with which he was afflicted.[7]

We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights. The record before us is clear that Urie became too ill to work in May of 1940 and that diagnosis of his condition was accomplished in the following weeks. There is no suggestion that Urie should have known he had silicosis at any earlier date. "It follows that no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time; consequently the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves . . . ." *Associated Indemnity Corp.* v. *Industrial Accident Commission*, 124 Cal. App. 378, 381. The quoted language, used in a state workmen's compensation case, seems to us applicable in every relevant particular to the construction of the federal statute of limitations with which we are here concerned. Accordingly we agree with the view expressed by the Missouri

---

[7] See *Pieczonka* v. *Pullman Co.*, 89 F. 2d 353, 356–357.

Supreme Court on the first appeal of this case, that Urie's claim, if otherwise maintainable, is not barred by the statute of limitations.[8]

We may readily dispose of another preliminary question concerning the issues which are now properly before us. Respondent argues, somewhat surprisingly, that the sufficiency of petitioner's original claim for negligence involved in the first appeal is not properly here, since it was neither raised nor considered on the second appeal to the Missouri Supreme Court. The short answer is that petitioner has brought the claim to this Court at his first opportunity; and it was not necessary for him to relitigate that claim a second time through the state courts in order to preserve it for our consideration on review of the final judgment rendered in the cause.

From the opinions of the state supreme court we know judicially[9] that its judgment negating the general claim for negligence was coupled with its subsequently repudiated conclusion that petitioner had stated a cause of action under the Boiler Inspection Act and that, consequently, the court remanded the cause for trial, not for dismissal. The judgment therefore was not final; it was interlocutory and not reviewable here within the meaning

---

[8] Compare the New York Court of Appeals' similar application, to a silicosis claim, of the Federal Employers' Liability Act's statute of limitations. *Sadowski* v. *Long Island R. Co.,* 292 N. Y. 448, 457–458.

[9] The opinion rendered on the first appeal, 352 Mo. 211, extensively quotes the original complaint's allegations concerning negligence, *id.* at 215–216; and a copy of that complaint appearing in the present record shows that the quotations comprehend substantially all of the allegations in that respect. The present record does not include a copy of the text of the judgment rendered on the first appeal; but that deficiency is merely formal, if it is a deficiency in any sense, since the opinions on both appeals supply us with full knowledge of the nature and effect of that judgment.

of our jurisdictional statute. 28 U. S. C. § 344 (b) [now § 1257 (3)].[10]

Although the Missouri Supreme Court's disposition of the first appeal precluded review here at that time of the ruling adverse to petitioner, Urie did not waive that question by amending his complaint, in conformity with the court's mandate, to state his claim more specifically in terms of the Boiler Inspection Act or by proceeding with trial on that theory. As the case then stood, this was his only remaining chance for success unless he was to waive it, ask for final judgment to be entered against him on the general negligence issue, and rely solely upon securing review of that judgment and reversal by this Court.

Whatever the effect of the state supreme court's ruling for further proceedings in the state courts,[11] it could not impose such an alternative upon petitioner. Local rules of practice cannot bar this Court's independent consideration of all substantial federal questions actually determined in earlier stages of the litigation by the court whose final adjudication is brought here for review. *Zeckendorf* v. *Steinfeld*, 225 U. S. 445, 454; *Messenger* v. *Anderson*, 225 U. S. 436, 444. Even so, we think sound practice would see to it that such questions were expressly preserved in the later stages of review. But, as this Court has had occasion heretofore to observe, its power to probe issues disposed of on appeals prior to the one under review is, in the last analysis, a "necessary correlative" of the rule which limits it to the examination

---

[10] "As its judgment upon the first writ was merely for a reversal of the court below and for a . . . trial, such judgment, not being final, could not be made the subject of a writ . . . from this court." *United States* v. *Denver & R. G. R. Co.*, 191 U. S. 84, 93. See *Coe* v. *Armour Fertilizer Works*, 237 U. S. 413, 418–419; *Gospel Army* v. *Los Angeles*, 331 U. S. 543, and authorities cited.

[11] Cf. *Creason* v. *Harding*, 344 Mo. 452, 463–464.

of final judgments. *Louisiana Navigation Co.* v. *Oyster Commission*, 226 U. S. 99, 102.[12]

Accordingly, even if it should be held that petitioner has stated no claim under the Boiler Inspection Act, the judgment now in review cannot stand unless the Missouri Supreme Court rightly concluded, on the first appeal, that petitioner's original complaint stated no cause of action for negligence under the Federal Employers' Liability Act, considered apart from any effect of the Boiler Inspection Act. That question is properly presented and to it we now turn.

## II.

Section 1 of the Federal Employers' Liability Act provides:

"Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any

---

[12] If it were otherwise, our corrective hand could be stayed by any local procedure which chose to resolve all substantial federal questions in an intermediate phase of litigation. The present case lends point to language used by this Court in dismissing a writ of error to a state court for lack of a final judgment: "When the litigation in the state courts is brought to a conclusion, the case may be brought here upon the federal questions already raised as well as any that may be raised hereafter; for although the state courts, in the proceedings still to be taken, presumably will feel themselves bound by the decision heretofore made by the [state] Supreme Court . . as laying down the law of the case, this court will not be thus bound." *Grays Harbor Co.* v. *Coats-Fordney Co.*, 243 U. S. 251, 256–257. Accordingly, even if it were assumed that no federal question of substance was decided on the second appeal and that the "basis for our jurisdiction must be found, if at all, in the decision and opinion of the state supreme court upon a prior appeal in the same case," petitioner Urie has "invoked the jurisdiction of this court at the first opportunity open to [him], and the federal question, having been considered by the state supreme court, is properly here." *Gant* v. *Oklahoma City*, 289 U. S. 98, 100. See, generally, Boskey, Finality of State Court Judgments under the Federal Judicial Code, 43 Col. L. Rev. 1002, 1007, 1016.

person *suffering injury* while he is employed by such carrier in such commerce . . . *for such injury or death resulting in whole or in part from the negligence* of any of the officers, agents, or employees of such carrier, *or by reason of any defect or insufficiency, due to its negligence,* in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 45 U. S. C. § 51. (Emphasis added.)

The section does not define negligence, leaving that question to be determined, as the Missouri Supreme Court said, "by the common law principles as established and applied in the federal courts." 352 Mo. at 218. *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, has no application. What constitutes negligence for the statute's purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes. Federal decisional law formulating and applying the concept governs.[13] Hence the Missouri Supreme Court's decision on the first appeal, that the complaint did not state a cause of action for negligence, is subject to our independent review and is not to be taken as governed conclusively by the state court decisions which alone were cited in support of the determination.

Of course if silicosis caused by the employment is not an "injury" within the statute's intended coverage, no cause of action could be stated for that injury under the statute, even though the allegations of fault and causation

---

[13] *Bailey* v. *Central Vermont R. Co.,* 319 U. S. 350, 352; *Chesapeake & Ohio R. Co.* v. *Kuhn,* 284 U. S. 44, 46–47; *St. Louis & I. M. R. Co.* v. *McWhirter,* 229 U. S. 265, 277; *Second Employers' Liability Cases,* 223 U. S. 1, 54–55, 57–58. Cf. *Schlemmer* v. *Buffalo, R. & P. R. Co.,* 205 U. S. 1.

were wholly sufficient. The Missouri Supreme Court's first decision, however, assumed that silicosis fell within the statute's broad term "injury," and held that it would not "be reasonable to hold, under the facts admitted by the demurrer, that defendant should have anticipated plaintiff's injury . . . ." 352 Mo. at 219. Accordingly, the court ruled that no cause of action for negligence under the Act had been stated.

Upon the assumption that silicosis when caused by the employment is a compensable employee "injury," the adequacy of petitioner's claim turns solely on whether his original complaint alleged facts raising a triable issue of negligence. We think that under the standards heretofore set and followed by this Court,[14] the facts alleged in the complaint and taken as admitted by the demurrer clearly stated a cause of action for negligence.

Those facts have been briefly, though only partially, summarized above. They charged that respondent used in the locomotives' sanders a sand material containing a very high percentage of silica or silicon dioxide; that often the material would come to the rails from the sanders in excessive and unnecessary quantities and would there be ground to dust; that the dust containing "such usual and unusual quantity of silican [sic] dioxide would come" into the engine cabs and, "frequently of unusual quantity," would be breathed by petitioner; and that respondent "knew, or by the exercise of due care should have known," that the sand contained the high percentage of silicon dioxide; that "the dust would form and frequently of excessive quantity because of said sanders,"

---

[14] See, e. g., *Ellis* v. *Union Pacific R. Co.*, 329 U. S. 649; *Western & Atl. Railroad* v. *Hughes*, 278 U. S. 496. Cf. *Brady* v. *Southern R. Co.*, 320 U. S. 476: *Chicago, M. & St. P. R. Co.* v. *Coogan*, 271 U. S. 472.

come into the cab and be breathed by petitioner; and that over a period of time the breathing was "dangerous to the health and life and would likely cause to the plaintiff the condition resulting to the plaintiff." The complaint then stated the further allegations set forth in the margin,[15] together with the following paragraph:

"Plaintiff further alleges that the sanding devices on said engines were all of the usual and customary type and used for the usual and customary purpose and if ordinary care was exercised in keeping them adjusted such large quantities of such sandy silica material would not escape; that plaintiff does not know whether the same kind of sand containing such high quality of silica was used by other railroads operating over or through such parts of the country of Missouri; that such sanding devices operated in the same manner by the same means as devices on locomotives of other railroads, and if kept in normal and regular working condition would not allow such large quantities of silica dust to form as above stated."

These and other allegations sufficiently charged respondent with knowingly having used, in excessive quan-

---

[15] "(2) Defendant negligently failed to furnish plaintiff a reasonably safe place in which to work in that the locomotives on which plaintiff was required to work as fireman were supplied with sand for the sanders thereof which contained a very high percentage of silica or silican [*sic*] dioxide as above, and defendant knew such fact and still defendant used same and used said engines under the conditions above described.

"(3) Although the defendant was using sandy substance containing such quantity of silica, and using said locomotives that would cause and allow large quantities of silica dust containing silica to be created and come into the cab and be inhaled, yet defendant negligently failed to warn the plaintiff and negligently failed to furnish him with a respirator or device to prevent the inhalation of said silica dust."

tities due in part to faulty adjustment of the sanders and respondent's failure to use due care in adjusting them, a dangerous sand material likely to cause silicosis and in fact causing petitioner to contract it and become permanently disabled. This would seem to be clearly adequate for stating a cause of action for negligence resulting in injury within the meaning of the statute and the applicable judicial standards to which we have referred. All the usual elements are comprehended, including want of due or ordinary care, proximate causation of the injury, and injury within our assumption for present purposes of statutory coverage.

To sustain the contrary view, however, the Missouri Supreme Court seems to have ruled as a matter of law that respondent had adhered to the customary standards of the trade, stressing the admission in petitioner's complaint that the sanding devices alleged to have been faultily adjusted were of the kind ordinarily used throughout the railroad industry. Contrary to the court's apparent conclusion, this obviously was not an admission that respondent had complied with the usual standards of the trade. There was neither admission by petitioner nor evidence of anything more than that respondent's sanders were "all of the usual and customary type" which, if kept properly adjusted by ordinary care, would not have allowed such large and excessive quantities of silica dust to escape, concentrate in the cab, and be breathed by petitioner. There was no admission that other railroads generally or in the region customarily used such high silica content materials for sanding purposes or that, if they did, they did not take steps to minimize potentially harmful effects. Moreover, assuming the premise that maintenance of trade standards negatives negligence, we cannot grasp its significance in this context absent any indication

that *faultily adjusted* sanding devices are the rule rather than the exception on American steam locomotives.

But we-also reject the premise, for we think that negligence, within the meaning of the Federal Employers' Liability Act, attached if respondent "knew, or by the exercise of due care should have known," that prevalent standards of conduct were inadequate to protect petitioner and similarly situated employees. Cf. *Hill* v. *Atlantic Coast Line R. Co.*, 336 U. S. 911, reversing 229 N. C. 236. See also *Sadowski* v. *Long Island R. Co.*, 292 N. Y. 448, 456–457.[16] Respondent's knowledge, actual or constructive, of the alleged inadequacies of the sanding equipment was a jury question. Whether petitioner was then or now would be able to shoulder the burden of proving respondent's knowledge we need not surmise, though the evidence adduced by petitioner at trial under the Boiler Inspection Act—indicating that others besides petitioner had observed and reported defects in respond-

---

[16] The decision in *Sadowski* v. *Long Island R. Co.*, 292 N. Y. 448, sustaining a recovery for silicosis under the Federal Employers' Liability Act, contained the following statements, which are relevant to the apparent ruling of the Missouri Supreme Court with respect to compliance with customary trade standards: "Evidence that *some* railroads furnished no such contrivances as plaintiff claimed were necessary for the use of men working under similar conditions or furnished similar places to work for men doing work similar to that required of plaintiff does not establish, as matter of law, that no such contrivances or no different place in which to work or no different appliances to carry on the work were required in the case at bar in the exercise of ordinary care. The ultimate question of fact was not what particular protective means someone else used in similar work. It was whether or not, under the particular conditions described in this case, the defendant furnished plaintiff a reasonably safe place in which to work and such protection in connection with his work against the inhalation of silica dust as would be expected of a person in the exercise of ordinary care under those conditions." 292 N. Y. at 456–457.

ent's locomotive equipment—underscores our insistence that issues of fact are matters for the jury.[17]

Accordingly we think the state court's ruling that the facts stated in the original complaint were insufficient to constitute a charge of negligence on respondent's part, within the meaning of the Federal Employers' Liability Act considered apart from the effect of the Boiler Inspection Act, was wrong and must be overruled. What was said by the New York Court of Appeals in *Sadowski* v. *Long Island R. Co.*, *supra* at 455–456, in sustaining a recovery for silicosis under the Act, fits very closely the facts of this case and represents, in our opinion, the correct view:

> "Ordinary care must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated from the neglect (*Railroad Co.* v. *Jones*, 95 U. S. 439; *Bailey* v. *Central Vermont Ry.*, *supra* [319 U. S. 350]). It must be commensurate with known dangers. Defendant created the

---

[17] After quoting petitioner's admission referred to above, the Missouri Supreme Court's opinion stated: "The implication from this allegation is that the sanders as such were not defective, but that the trouble was maladjustment. Just what was wrong with the adjustment is not alleged, and plaintiff does not claim that the situation is one for the res ipsa loquitur rule." 352 Mo. at 219.

The inference drawn by the court was, in effect, either a rule of law that using maladjusted sanders could not be negligence even though caused, as petitioner expressly alleged, by respondent's want of due care; or alternatively a ruling, as matter of law, that to constitute a sufficient showing of negligence the allegation of maladjustment must specifically state the types and causes of it. Neither conclusion accords with applicable federal standards in such cases. If the latter was the court's intention, the matter was at most one for permitting amendment or cure by proof; if the former, the conclusion ran in the teeth both of federal and of generally accepted standards for showing negligence.

place in which the work was done and supervised the doing of the work by plaintiff and was aware for a period of at least sixteen years of the conditions under which plaintiff was required to work and of the means and methods by which its work was accomplished. It is a matter of common knowledge that it is injurious to the lungs and dangerous to health to work in silica dust, a fact which defendant was bound to know." [18]

The question remains whether silicosis is an "injury" within the meaning of that term as used in the Federal Employers' Liability Act. It is a novel one for this Court. But we think silicosis is within the statute's coverage when it results from the employer's negligence. Considerations arising from the breadth of the statutory language, the Act's humanitarian purposes, its accepted standard of liberal construction in order to accomplish those objects, the absence of anything in the legislative

---

[18] Nor do we find merit in respondent's contention that Urie, prior to the 1939 amendment abolishing assumption of risk as a defense to ordinary negligence suits under the Federal Employers' Liability Act, 45 U. S. C. § 54, 53 Stat. 1404, amending 35 Stat. 66, assumed the risk of injury. Nothing in Urie's original complaint remotely suggests such knowledge on his part of the likelihood of contracting silicosis as would justify the conclusion that Urie "anticipated and decided to chance the particular risk . . . ." *Owens* v. *Union Pacific R. Co.*, 319 U. S. 715, 723. Accordingly we are not called on to determine whether any retroactive effect is to be given the 1939 amendment, which this Court has described as requiring that "cases tried under the Federal Act . . . be handled as though no doctrine of assumption of risk had ever existed." *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U. S. 54, 64. Specifically we need not consider whether, even assuming the amendment was not intended to cover injuries accruing before its enactment but sued on thereafter (an open question in this Court, see *Owens* v. *Union Pacific R. Co.*, *supra* at 725), the amendment nonetheless covers injuries which, like Urie's, accrued and were sued on thereafter but where the beginning of the alleged assumption of risk may have antedated the amendment.

history indicating a congressional intent to require a restricted interpretation or expressly to exclude such occupational disease, and the trend of existing authorities dealing with the question, combine to support this conclusion.

We recognize of course that, when the statute was enacted, Congress' attention was focused primarily upon injuries and death resulting from accidents on interstate railroads.[19] Obviously these were the major causes of injury and death resulting from railroad operations. But accidental injuries were not the only ones likely to occur. And nothing in either the language or the legislative history discloses expressly any intent to exclude from the Act's coverage any injury resulting "in whole or in part from the negligence" of the carrier. If such an intent can be found, it must be read into the Act by sheer inference.

The language is as broad as could be framed: "any person suffering injury while he is employed"; "such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier"; "by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances," etc. On its face, every injury suffered by any employee while employed by reason of the carrier's negligence was made compensable. The wording was not restrictive as to the employees covered; the cause of injury, except that it must constitute negligence attributable to the carrier; or the particular kind of injury resulting.

To read into this all-inclusive wording a restriction as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, would be contradictory to the wording, the remedial and humanitarian purpose, and the constant and established

[19] See 42 Cong. Rec. 4265, 4426–4439, 4526–4551, 4755; H. R. Rep. No. 1386, 60th Cong., 1st Sess.; S. Rep. No. 460, 60th Cong., 1st Sess.

course of liberal construction of the Act followed by this Court.[20]

We recognize, with respondent, that the Federal Employers' Liability Act is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms. If respondent were right in suggesting that the common law does not recognize occupational disease as a category of compensable injury, he would lend substance to the argument that Congress' use of the word "injury" was less broad than the word's surface connotation indicates. However, although the contrary view has been advanced,[21] we are satisfied that the difficulties which have attached to tort recovery for occupational disease inhere not in the nature of the wrong but in the difficulty of proving negligence. For, as the Ohio Supreme Court observed with reference to silicosis, "In the early period of industrial development there was little medical knowledge regarding the origin of diseases peculiar to the various employments . . . ." *Triff* v. *National Bronze & Aluminum Foundry Co.*, 135 Ohio St. 191, 195. We do not doubt that at "common law the incurring of a disease or harm to health is such a personal wrong as to warrant a recovery if the other elements of liability for tort are present." [22]

---

[20] "The Act is not to be narrowed by refined reasoning . . . . It is to be construed liberally to fulfill the purposes for which it was enacted . . . ." *Jamison* v. *Encarnacion,* 281 U. S. 635, 640. Similarly, the Boiler Inspection Act, "like the Safety Appliance Act, is to be liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment." *Lilly* v. *Grand Trunk R. Co.*, 317 U. S. 481, 486.

[21] See, e. g., *Cell* v. *Yale & Towne Mfg. Co.*, 281 Mich. 564, 566; but cf. *id.* at 567–568.

[22] *Hurle's Case*, 217 Mass. 223, 224; see *Hood & Sons* v. *Maryland Casualty Co.*, 206 Mass. 223; cf. *Gentry* v. *Swann Chemical Co.*, 234 Ala. 313, 317–318. See Banks, Employer's Liability for Occupational Diseases, 16 Rocky Mt. L. Rev. 60, 61–64.

Viewing the Federal Employers' Liability Act as a negligence statute, we think that arguments drawn from the coverage accorded occupational diseases in state workmen's compensation statutes cannot control the present inquiry. And yet we may note in passing that decisions under such statutes, to whatever extent they may be thought relevant, offer little support to respondent's narrow view of the federal legislation before us. True it is that the British Workmen's Compensation Act of 1897, 60 & 61 Vict. c. 37, although covering anthrax contracted by claimant from a particular and identifiable processing of wool, *Turvey* v. *Brintons, Ltd.*, [1904] 1 K. B. 328, affirmed [1905] A. C. 230, was held to exclude gradual lead poisoning. *Steel* v. *Cammell, Laird & Co.*, [1905] 2 K. B. 232. But it is equally true that the statute there construed provided for compensation only in cases of "personal injury *by accident*," (emphasis added), a limitation much stressed by the opinions in *Steel* v. *Cammell, Laird & Co., supra.* And see *Walker* v. *Lilleshall Coal Co.*, [1900] 1 Q. B. 488. Decisions in this country have uniformly followed the early British rule in construing such terms as "accident" and "accidental injury," as well as "personal injury by accident." [23]

But decisions construing "personal injury"—more nearly akin to the simple "injury" of the Federal Employers' Liability Act—are in conflict. Thus the Supreme

---

[23] See, e. g., *Jeffreyes* v. *Sager Co.*, 198 App. Div. 446, affirmed 233 N. Y. 535; *Iwanicki* v. *State Industrial Accident Commission*, 104 Ore. 650. Restrictive constructions of the term "accident" and its variants have generally been followed by agitation, now largely successful, for legislation specifically extending compensation to occupational disease. See, e. g., Perry, Occupational Disease Legislation, 5 Newark L. Rev. 83; Occupational Disease Compensation, 26 Am. Lab. Leg. Rev. 2; Andrews, The Tragedy of Silicosis, *id.* at 3. For local studies of the problems posed see Owens, Diseases and Injuries to Health under the Wisconsin Workmen's Compensation Act, 1945 Wis. L. Rev. 357; 3 John Marshall L. Q. 241.

Court of Ohio excluded occupational diseases in view of the special legislative and constitutional context of the statute considered, while recognizing that otherwise it would be "no difficult matter to bring within the purview of the words 'personal injuries sustained in the course of employment' occupational diseases incurred in course of employment." *Industrial Commission* v. *Brown,* 92 Ohio St. 309, 312–313; cf. *Industrial Commission* v. *Roth,* 98 Ohio St. 34. The Connecticut Supreme Court, relying on its common-law view that "typical" occupational diseases were not compensable, likewise excluded occupational diseases from its "personal injury" statute. *Miller* v. *American Steel & Wire Co.,* 90 Conn. 349. But against this line of authority may be set the view of the Supreme Judicial Court of Massachusetts, speaking by Chief Justice Rugg, which held that blindness caused by noxious industrial vapors was a "personal injury" within the meaning of the Massachusetts statute. *Hurle's Case,* 217 Mass. 223.

Consonant with the Massachusetts statute is the one compensation act the meaning of which may be thought directly to bear on congressional use of the word "injury" in the federal negligence statute with which we are today concerned. The Federal Employees' Compensation Act of May 30, 1908, 35 Stat. 556, approved less than two months after the Federal Employers' Liability Act, provided compensation for certain classes of federal employees "injured in the course of . . . employment." Under this statute compensation was awarded for, *inter alia,* inhalation of dust and fine scale,[24] lead poisoning,[25]

---

[24] Claim of Edward Edmonds, June 23, 1913, Opinions of Solicitor, U. S. Department of Labor (1915) 259.

[25] Claim of Willard E. Jule, July 28, 1913, Opinions of Solicitor, U. S. Department of Labor (1915) 261; cf. Claim of C. M. Arata, Dec. 31, 1913, *id.* at 264 (lead poisoning and bronchitis).

cardiac hypertrophy caused by inhalation of ether,[26] and throat tuberculosis aggravated by brass poisoning.[27] In short,.the workmen's compensation cases offer little com-

[26] Claim of Basil E. Clark, Apr. 11, 1914, Opinions of Solicitor, U. S. Department of Labor (1915) 270.

[27] Claim of Edward Devine, Feb. 9, 1915,. Opinions of Solicitor, U. S. Department of Labor (1915) 277.. Whether the earlier decision that pneumonia was not compensable, Claim of John Sheeran, Apr. 25, 1910, 28 Op. Atty. Gen. 254, is consistent with the foregoing cases, or with cases awarding compensation for "the bends," Claim of Wm. Murray, Nov. 3, 1911, Opinions of Solicitor, U. S. Department of Labor (1915) 239, or sunstroke, Claim of J. J. Walsh, Mar. 16, 1911, id. at 231, we need not determine; Congress' dissatisfaction with the distinction is clear from the course of subsequent legislation:

When the Federal Employees' Compensation Act of May 30, 1908, was superseded in 1916 by the broader and still extant general federal employee compensation system, 5 U. S. C. § 751 et seq., the statute as originally enacted provided compensation for "disability" or "personal injury" without further qualification or definition. 39 Stat. 742. Proposals specifically to include occupational disease were rejected, at least in part, for the reasons that at the committee hearings "there was considerable difficulty in defining the term 'occupational disease'; and it was also called to our attention that in quite a number of cases in a number of States the court held this language which we have in the bill would cover occupational diseases in certain cases— at least a number of them . . ..." 53 Cong. Rec. 10899. In 1924 the 1916 Act was amended, 43 Stat. 389, "to correct two rulings of the Comptroller General of the United States . . . ." H. R. Rep. No. 280, 68th Cong., 1st Sess. 1. One of the rulings remedied was that occupational diseases were not included within the 1916 Act; the other ruling was that the Comptroller General had power to review decisions of the United States Employees' Compensation Commission. As to the first of these errors, the House Judiciary Committee, in reporting out the 1924 amendment, expressly referred to its 1916 report, H. R. Rep. No. 678, 64th Cong., 1st Sess. 7, to show that in drafting the 1916 Act "the committee intended to remedy the inadequacy of the act of May 30, 1908, with reference to 'occupational diseases.'" H. R. Rep. No. 280, 68th Cong., 1st Sess. 3. See 65 Cong. Rec. 8154.

fort to respondent's view of the Federal Employers' Liability Act.

While no decision of this Court involving the Federal Employers' Liability Act has dealt specifically with silicosis, the New York Court of Appeals, as we have indicated above, has sustained recovery under the Act for that disease when resulting from the carrier's negligence. This was done in circumstances not substantially different from those alleged in petitioner's original complaint, except that the facts involved no possible application of the Boiler Inspection Act. *Sadowski* v. *Long Island R. Co., supra.* Moreover, other state and federal decisions have authorized recovery under the Act for injuries not caused by accidental or violent means. These include *Shelton* v. *Thomson,* 148 F. 2d 1; 157 F. 2d 709, where recovery was permitted for carbon monoxide poisoning; *B. & O. R. Co.* v. *Branson,* 128 Md. 678, reversed on other grounds, 242 U. S. 623, in which recovery was allowed for paint poisoning. Cf. *C. R. I. & P. R. Co.* v. *Cheek,* 105 Okla. 91. Not all of these decisions could be sustained if the statutory term "injury" were held to require that the harm suffered from the employer's negligence must be confined to that inflicted by "external, violent and accidental" means or be an "accidental injury," as respondent's narrow view of the statute's coverage seems to contemplate.

We would be most hesitant to adopt a construction of "injury" as used in this Act which would overrule the decisions last cited or seriously impair their authority. We think they were made in the spirit the statute contemplated for its administration and application. That spirit is one not in conformity with importing nice distinctions in applying the Act's broad and general terms or cutting down their full scope by inference or implication.

In our view, when the employer's negligence impairs or destroys an employee's health by requiring him to work

under conditions likely to bring about such harmful consequences, the injury to the employee is just as great when it follows, often inevitably, from a carrier's negligent course pursued over an extended period of time as when it comes with the suddenness of lightning. Silicosis is as much "injury," leading in time as certainly to permanent disability, as scalding from a boiler's explosion. We do not think the mere difference in the time required for different acts of negligence to take effect and disclose their harmful, disabling consequences would justify excluding the one type of injury from the Act's coverage or that such an exclusion would be consistent with its language, purposes, or unvarying standards of construction.

, Accordingly it follows, as the Missouri Supreme Court assumed on the first appeal, that petitioner's original complaint did not fail in stating a cause of action under the Federal Employers' Liability Act for want of allegation of sufficient injury. Petitioner was entitled to go to trial at that time without restriction requiring him to show violation of the Boiler Inspection Act.

This conclusion, if it were all that is involved in the case, would compel reversal of the state supreme court's decision and remand for trial upon the original complaint. However, it remains to consider the effect of the Boiler Inspection Act and whether the verdict rendered for petitioner under that Act, in conjunction with the Federal Employers' Liability Act, should be allowed to stand.

### III.

By virtue of the course taken by the case in the state courts, the Missouri Supreme Court did not squarely hold that silicosis was not an injury within the coverage of the Federal Employers' Liability Act considered apart from the Boiler Inspection Act. As the case took shape that question did not arise on the first appeal. And by

virtue of the ruling on the remand for trial, that the only cause of action stated was that arising under the Boiler Inspection Act, the court on the second appeal treated the question whether silicosis was a compensable injury substantially as if the Boiler Inspection Act was a wholly independent statute, unrelated in the scope of its coverage, for purposes of employees' suits for breach of its provisions, to the Employers' Liability Act's terms, *i. e.*, as if the question arose solely under the Boiler Inspection Act.

But by its own terms the Boiler Inspection Act, like the Safety Appliance Acts,[28] does not purport to confer any right of action upon injured employees. It merely makes violation of its prohibitions "unlawful." [29] Yet it has been held consistently that the Boiler Inspection Act supplements the Federal Employers' Liability Act by imposing on interstate railroads "an absolute and continuing duty" to provide safe equipment. *Lilly* v. *Grand Trunk R. Co., supra* at 485; *Southern R. Co.* v. *Lunsford,* 297 U. S. 398, 401; cf. *Baltimore & O. R. Co.* v. *Groeger,* 266 U. S. 521, 528–529.

This conclusion stems, not from any express statutory language, but by implication from §§ 3 and 4 of the Federal Employers' Liability Act, 45 U. S. C. §§ 53, 54, which bar pleadings of, respectively, contributory negligence and assumption of risk "in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." [30] But it is § 1 of the Federal Employers'

---

[28] 45 U. S. C. § 1 *et seq.*

[29] See note 4 and text.

[30] In ordinary negligence claims under the Federal Employers' Liability Act, contributory negligence while not a bar to the action is available in diminution of damages, 45 U. S. C. § 53, 35 Stat. 65, 66. Assumption of risk was a complete defense to negligence claims, *Seaboard Air Line* v. *Horton,* 233 U. S. 492, 503, until its abolition

Liability Act, and not §§ 3 and 4, which expressly creates a cause of action for negligence; and by the same token it is § 1 which is the basis of an employee's suit for violation of the Boiler Inspection or Safety Appliance Acts. For where § 1 "refers to 'any defect or insufficiency, *due to its negligence,* in its cars, engines, appliances,' etc., it clearly is the legislative intent to treat a violation of the Safety Appliance Act as 'negligence'—what is sometimes called negligence *per se.*" *San Antonio & A. P. R. Co.* v. *Wagner,* 241 U. S. 476, 484.

In this view the Safety Appliance Acts, together with the Boiler Inspection Act, are substantively if not in form amendments to the Federal Employers' Liability Act. They dispense, for the purposes of employees' suits, with the necessity of proving that violations of the safety statutes constitute negligence; and making proof of such violations is effective to show negligence as a matter of law. Thus taken, as has been the consistent practice, the Boiler Inspection and Safety Appliance Acts cannot be regarded as statutes wholly separate from and independent of the Federal Employers' Liability Act. They are rather supplemental to it, having the purpose and effect of facilitating employee recovery, not of restricting such recovery or making it impossible.

---

in 1939. 45 U. S. C. § 54, 53 Stat. 1404, amending 35 Stat. 66. See *Tiller* v. *Atlantic Coast Line R. Co.,* 318 U. S. 54.

The quoted statutory phrase was held to acknowledge creation of a cause of action "under the Federal Employers' Liability Act" for personal injury to an employee due to violation of the Safety Appliance Acts, 45 U. S. C. § 1 *et seq.,* since, "By the phrase 'any statute enacted for the safety of employees' the Congress evidently intended to embrace its Safety Appliance Acts." *Moore* v. *C. & O. R. Co.,* 291 U. S. 205, 210. Similarly an employee injury suit alleging violation of the Boiler Inspection Act is brought "under the Federal Employers' Liability Act . . . ." *Lilly* v. *Grand Trunk R. Co.,* 317 U. S. 481, 485.

Regarded in this light, the Boiler Inspection and Safety Appliance Acts would take on highly incongruous character if, at the very time they were expediting employee recovery under the Employers' Liability Act by substituting the comparatively light burden of proving violation of their prohibitions for the heavier one of proving negligence, they were also contracting the scope of compensable injuries and to that extent defeating recovery altogether. We do not think that Congress intended to act so inconsistently or that, by dispensing with the employee's burden of proving negligence in certain classes of Employers' Liability Act suits, it had any purpose to withdraw from that Act's coverage any injury caused by the employment which was covered by its terms. In the absence of any specific showing that Congress had in mind such a restrictive and inconsistent object, we are not free to create one by inference, more especially when it is derived from approaching the problem as if the Boiler Inspection and Safety Appliance Acts were wholly independent of and separate in design and purpose from the Employers' Liability Act.

The congressional purpose underlying the Boiler Inspection Act is basically the same as that underlying the Safety Appliance Acts and the Employers' Liability Act. In requiring that the boiler, and, not long after, that the entire locomotive, be maintained "in proper condition and safe to operate," Congress by its own statement was attempting to insure that such equipment "be employed in . . . active service . . . without unnecessary peril to life or limb . . . ." 45 U. S. C. § 23. Certain requirements of the Safety Appliance Acts, as for example the use of the automatic coupler, 45 U. S. C. § 2, are made mandatory by express statutory language. Others, like those of the Boiler Inspection Act, simply outline a general standard which may be more specifically articulated in rules enunciated by the carriers subject to the approval

of the Interstate Commerce Commission, 45 U. S. C. § 28, or directly promulgated by the Commission, *Napier* v. *Atlantic Coast Line R. Co.*, 272 U. S. 605, 611–613, on the basis of proper findings. *United States* v. *B. & O. R. Co.*, 293 U. S. 454. Violations of the Commission's rules are violations of the statute, giving rise not only to damage suits by those injured, *Lilly* v. *Grand Trunk R. Co.*, *supra*, but also to money penalties recoverable by the United States. 45 U. S. C. § 34.

As with the Employers' Liability Act, we do not doubt that the prime purpose of the Boiler Inspection Act was the protection of railroad employees and perhaps also of passengers and the public at large, cf. *Fairport, P. & E. R. Co.* v. *Meredith*, 292 U. S. 589, from injury due to industrial accident. The safety of all those affected by railroading was uppermost in the legislative mind. But again, as with the Employers' Liability Act, we cannot accept the view that protection of employee health is not embraced by the congressional plan.[31] Indeed, as to the Boiler Inspection Act, this Court has twice had

---

[31] Respondent places some reliance on the proposition that congressional limitation of the Boiler Inspection Act to accidental injury must be inferred from the provision requiring the carrier to report every locomotive "accident" resulting in "serious injury." 45 U. S. C. § 32. We see no reason to think that a policy requiring the reporting of all injuries the causes of which are readily identifiable in terms of time and place compels the conclusion that other injuries, the origins of which may be remote and ill-defined at the moment of diagnosis, should not be compensable when the carrier's underlying responsibility becomes a matter of demonstrable fact. It is to be noted, furthermore, that an argument similar to respondent's was rejected with reference to congressional intent to include occupational diseases in the 1916 Federal Employees' Compensation Act, H. R. Rep. No. 280, 68th Cong., 1st Sess. 3, and, although advanced with reference to the 1908 Federal Employees' Compensation Act, Claim of A. E. Clark, Dec. 17, 1908, Opinions of Solicitor, U. S. Department of Labor (1915) 188, 190, did not bar compensation of the questionably "accidental" injuries described in the text at notes 24–27 *supra*.

occasion to make clear its contrary view, *Napier* v. *Atlantic Coast Line R. Co., supra; United States* v. *B. & O. R. Co., supra* at 458–459.

In the *Napier* case the question for decision was the validity of Wisconsin and Georgia regulations requiring locomotives to be equipped with, respectively, cab curtains and an automatic fire door. Each state regulation was challenged as an invasion of power over interstate commerce which Congress, through enactment and amendment of the Boiler Inspection Act, had seen fit to exercise. Each regulation was defended as being directed to protection of the health, rather than the safety, of railroad employees. The unanimous Court, speaking through Mr. Justice Brandeis, struck down both regulations "because the Boiler Inspection Act, as we construe it, was intended to occupy the field. The broad scope of the authority conferred upon the Commission leads to that conclusion. Because the standard set by the Commission must prevail, requirements by the States are precluded, however commendable or however different their purpose." 272 U. S. at 613.

This last-quoted sentence merely recognized that theretofore the Interstate Commerce Commission had not regulated with an eye to employee health; it did not and does not support the view that employee health was thought not to be within the compass of the Act, as other language in *Napier,* 272 U. S. at 611–613, makes amply clear:

> "The requirements here in question are, in their nature, within the scope of the authority delegated to the Commission. An automatic firedoor and an effective cab curtain may promote safety. Keeping firemen and engineers in good health, like preventing excessive fatigue through limiting the hours of service, clearly does so, although indirectly . . . . .

"If the protection now afforded by the Commission's rules is deemed inadequate, application for relief must be made to it. The Commission's power is ample."

Thus the Boiler Inspection Act vests in the Interstate Commerce Commission rule-making power adequate to protect employees against disease as well as against accident; and the power to make rules for employee health has been exercised.[32]

In view of these considerations, it cannot be said that the Commission's rule-making power is confined to safe-

[32] *E. g.*, the requirement for closing "unnecessary or excessive openings in locomotive cabs," imposed by I. C. C. Rule 116 (g), 49 C. F. R. § 91.116 (g), after the *Napier* decision, was, as the opinion announcing the rule makes plain, designed to protect the health of firemen and engineers from wind, snow and rain. *Wisconsin R. R. Comm'n v. A. & R. R. Co.*, 142 I. C. C. 199. The rule, not squarely applicable to the present case since limited to the winter months, was formulated after extended hearings in a proceeding in which the Missouri Pacific, like almost every other major American railroad, was a named party defendant. *Wisconsin R. R. Comm'n v. A. & R. R. Co.*, *supra*, Transcript of Record, Complaint of Railroad Commission of Wisconsin, p. 17. In the light of the instant case, it is of interest to note that the Engineers' Brotherhood and the Firemen's Brotherhood, interveners in support of the proposed rule, alleged need for protection from, *inter alia*, "excessive . . . sand and dust storms." Transcript of Record, *supra*, Joint Petition of Intervention of Alvanley Johnston and D. B. Robertson, p. 3; Amended Joint Petition of Intervention of Alvanley Johnston and D. B. Robertson, p. 3. No substantial evidence seems to have been adduced to support the allegation, Transcript of Record, *supra*, Brief for Intervening Brotherhoods, pp. 14–15, although there was evidence of severe winter wind in Missouri, Transcript of Record, *supra*, at 2056, and in other parts of the country, *id.* at 2136, 2369, 4541, 5005, 6088, 6350. The Interstate Commerce Commission noted in its opinion that "The amendments to rule 116 should be regarded as minimum requirements which are not intended to take care of the most extreme conditions." 142 I. C. C. 199, 210

guarding against accidental injury; nor are we free to lay down a rule of law which would so restrict the Commission's authority. Since we are unable to find in the Boiler Inspection Act's terms, purposes or legislative history either explicit provision or any sufficient basis for inferring one cutting down the scope of recovery allowed under § 1 of the Employers' Liability Act, we conclude that the injury for which recovery may be had for violation of the Boiler Inspection Act is no narrower in scope than the injury for which recovery is authorized under § 1 of the Employers' Liability Act.

We hold that petitioner's injury is one compensable under the Boiler Inspection Act. We hold further, in the light of the trial instructions and such evidence as appears in the record before us,[33] that the jury was justified in finding (1) that respondent breached the Boiler

---

[33] The only evidence before us is the partial summary of petitioner's case by the Missouri Supreme Court on the second appeal: "Bruce Brill, a witness for plaintiff, testified he had worked at the Missouri Pacific roundhouse at Joplin for about 18 years and until November 4, 1942; that the 'engines that came in . . .. I would say most of them, at least three out of five, would have the sanders reported in bad order . . . maybe it was a broken nipple, something in the dome, or a loose connection.' A broken nipple would cause the sand to dribble on to the rails under the drivers, and the 'speed would suck it up into the cab after it was ground under the wheels.' The dust would be sucked in 'through the deck and around the boiler head or openings in the grate shakers.' When the witness cleaned out the cabs he found sand particles and roadbed dust. . . . Plaintiff testified the (sand) dust would 'come up through the openings in the cab floors, around the grate shaker riggings and the stoker head in the deck of the engine on each side of the fire door against the boiler head. . . . Sometimes there would be wide cracks between the boiler head and the deck floor where the bolts were broken off and it was worn and loose. The deck boards would be cracked and sometimes slivered out, and it would come through any openings like that; . . . would collect on the lights; . . . would get our clothing very dusty; . . . make your mouth and nose very dry.'" 357 Mo. at 744–745.

Inspection Act (as more specifically articulated in I. C. C. Rule 120, governing sanders)[34] and (2) that such breach was a proximate cause of petitioner's injury.

[34] I. C. C. Rule 120, 49 C. F. R. § 91.120, applicable to steam locomotives, provides: "Locomotives shall be equipped with proper sanding apparatus, which shall be maintained in safe and suitable condition for service, and tested before each trip. Sand pipes must be securely fastened in line with the rails."

It is of no consequence that Rule 120 may not have been specifically called to the jury's attention. *Lilly* v. *Grand Trunk R. Co.*, 317 U. S. 481, 488–489. It is urged upon us that Rule 120 was designed to insure an adequate auxiliary braking system rather than to protect employees against silicosis, and hence that, notwithstanding respondent's breach of the rule and the governing statute, petitioner cannot complain of an injury flowing from the breach which was not the injury the Interstate Commerce Commission sought to guard against. We do not dispute the narrow scope of Rule 120; nor do we doubt that conventional tort doctrine imposes absolute liability for violation of a statutory duty only where the injury is one the statute was designed to prevent. See, e. g., *DiCaprio* v. *New York Central R. Co.*, 231 N. Y. 94; but cf. the remarks of Mr. Justice Brewer in *Atchison, T. & S. F. R. Co.* v. *Reesman*, 60 F. 370, 373. But we think the liability imposed by the Boiler Inspection Act is of broader character and that the correct rule is the one laid down in *Louisville & N. R. Co.* v. *Layton*, 243 U. S. 617, 621, which this Court has had repeated occasion to apply in connection with the Safety Appliance Acts: "The language of the acts and the authorities we have cited make it entirely clear that the liability in damages to employees for failure to comply with the law springs from its being made unlawful to use cars not equipped as required,—not from the position the employee may be in or the work which he may be doing at the moment when he is injured. This effect can be given to the acts and their wise and humane purpose can be accomplished only by holding, as we do, that carriers are liable to employees in damages whenever the failure to obey these safety appliance laws is the proximate cause of injury to them when engaged in the discharge of duty." See *Davis* v. *Wolfe*, 263 U. S. 239, 243; *Coray* v. *Southern Pacific Co.*, 335 U. S. 520, 522–523; *Brady* v. *Terminal R. Assn.*, 303 U. S. 10, 16; *Swinson* v. *Chicago, St. P., M. & O. R. Co.*, 294 U. S. 529, 531; *Fairport, P. & E. R. Co.* v. *Meredith*, 292 U. S. 589. Cf. *Minneapolis & St. Louis R. Co.* v. *Gotschall*, 244 U. S. 66; *St. Louis & S. F. R. Co.* v. *Conarty*, 238 U. S. 243.

We conclude that petitioner stated a valid claim for negligent injury under the Federal Employers' Liability Act on his first appeal and that petitioner stated on both appeals and proved on his second a valid claim for injury flowing from violation of the Boiler Inspection Act. The record before us reveals no error in the jury's verdict for petitioner, which was based on the second theory of the case; the damages awarded are consistent with either theory. We have considered and disposed of the various grounds of affirmance urged by respondent; grounds not urged, whether on the record before us or on such supplemental portions of the state court record as respondent might have asked us to review, are waived. Accordingly the judgment is reversed and the cause is remanded with instructions to reinstate the judgment on the verdict for petitioner.

*Reversed.*

Mr. Justice Frankfurter, concurring in part.

At the risk of wearisome reiteration it is relevant to say again that the common-law concept of negligence is an antiquated and uncivilized basis for working out rights and duties for disabilities and deaths inevitably due to the conduct of modern industry. In the conscious or unconscious endeavor not to have the human cost of industry fall with cruel injustice upon workers and their families, the law of negligence gives rise to endless casuistry. So long as the gamble of an occasional heavy verdict is not replaced by the security of a modern system of insurance, courts must continue to apply the notion of negligence in situations for which it was never intended. Therefore, if a claim is made that an injury is causally related to a carrier's failure to maintain standards of care appropriate for employment on a railroad, the Federal Employers' Liability Act entitles an employee to establish that claim to a jury's satisfaction. Damages are re-

coverable under that Act for suffering "injury." That term, it seems to me, is sufficiently broad to include bodily injury which nowadays is more specifically characterized as "occupational disease." Accordingly, I agree that recovery may be had under the Federal Employers' Liability Act for silicosis, where the facts sustain such a claim, as is illustrated by the case of *Sadowski* v. *Long Island R. Co.*, 292 N. Y. 448, 55 N. E. 2d 497.

On the other hand, I agree with the Missouri Supreme Court that occupational diseases cannot be fitted into the category of "accidents" for which the Boiler Inspection Act devised a scheme of regulation and a basis of liability. 36 Stat. 913, as amended, 45 U. S. C. §§ 22–34. I think I appreciate the humane impulse which seeks to bring occupational diseases within such a regime. But due regard for the limits of judicial interpretation precludes such free-handed application of a statute to situations outside its language and its purpose. To do so, moreover, is, I believe, a disservice to the humane ends which are sought to be promoted. Legislation is needed which will effectively meet the social obligations which underlie the incidence of occupational disease. See National Insurance (Industrial Injuries) Act, 1946, 9 & 10 Geo. 6, 488, particularly Part IV. The need for such legislation becomes obscured and the drive for it retarded if encouragement is given to the thought that there are now adequate remedies for occupational diseases in callings subject to Congressional control. The result of the present decision is to secure for this petitioner the judgment which the jury awarded him. It does not secure a proper system for dealing with occupational diseases.

I would reverse this judgment and remand the case to the Supreme Court of Missouri for proceedings consistent with this opinion.

MR. JUSTICE REED, MR. JUSTICE JACKSON, and MR. JUSTICE BURTON join in this opinion.