COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

HANS HARRIS, §

Appellant, §

v. §

BNSF RAILWAY COMPANY, §

Appellee. §

§

No. 08-11-00018-CV

Appeal from the

342nd District Court

of Tarrant County, Texas

(TC# 342-235434-09)

**O P I N I O N**

Appellant Hans Harris ("Appellant") appeals the trial court's grant of Appellee BSNF

Railway Company's ("Appellee") motion for summary judgment as to Appellant's cause of action

for violation of the Locomotive Inspection Act.[1]   Appellant's sole issue is that the trial court erred

in granting Appellee's summary judgment motion, as a matter of law, by finding that a defective

fuel gauge and in-cab display did not create an unnecessary risk of personal injury.   We affirm.

**PROCEDURAL BACKGROUND**

Appellant filed suit on January 12, 2009, against Appellee, his employer, asserting causes

of action under the Locomotive Inspection Act[2] ("LIA") and the Federal Employer's Liability

Act[3] ("FELA").   Appellee filed a traditional motion for summary judgment ("MSJ") as to both

causes of action, asserting that:   (i) the defective fuel gauge on the locomotive did not create an

---

[1] This case was transferred from the Second Court of Appeals to this Court pursuant to a docket equalization order entered by the Texas Supreme Court.  *See* TEX.GOV'T CODE ANN. § 73.001 (West 2005).   We have applied precedent of the Fort Worth Court of Appeals.  *See* TEX.R.APP.P. 41.3.

[2] Formerly known as the Boiler Inspection Act ("BIA") 49 U.S.C. § 20701 *et seq.* (West 2012)

[3] 45 U.S.C.A. § 51 *et seq.*

unnecessary peril to life or limb as required to impose strict liability under the LIA; and (ii) it had conclusively negated the common causation element of the two causes of action based on contributory negligence. Appellant filed a response. The trial court heard arguments and orally announced that the court was granting the MSJ as to the LIA claim, but denying as to the FELA claim. As it was the trial judge's last day on the bench, no written order was signed.

Appellant filed a motion for reconsideration of the oral ruling. The trial court granted Appellant's motion and signed a written order denying Appellee's MSJ in its entirety. Appellee subsequently filed a no-evidence motion for partial summary judgment on the FELA cause of action and a motion re-urging its original MSJ, to which Appellant responded. The trial court heard arguments and took the motions under advisement. Appellee then filed a motion for leave to file supplemental evidence in support of its motion re-urging the MSJ. The trial court denied the no-evidence motion and the motion for leave to file supplemental evidence, and granted the motion re-urging the MSJ as to the LIA cause of action, finding that "there is legally insufficient evidence to support a finding that the defective fuel gauge and/or fuel gauge display created an unnecessary danger of personal injury." The order denied the MSJ as to the "legally insufficient evidence of causation" argument asserted by Appellee. The same day the court signed an order on Appellant's motion to sever and abate the FELA claim, rendering the MSJ as a final, appealable judgment on the LIA cause of action. Appellant timely appealed.

## FACTUAL BACKGROUND

Appellant was serving as a conductor on a coal train operated by Appellee which was leaving the Saginaw, Texas rail yard ("Saginaw") near Fort Worth on January 1, 2008. The train engineer was Rocky Rhodes ("Rhodes"). In his deposition, Rhodes testified that he had not

2

performed an inspection of the train on the ground prior to departing the yard due to the presence of a signed daily inspection card in the locomotive which indicated that it had been inspected in Amarillo the previous night. He stated that the inspection was valid until 12 a.m. on January 1, 2008. The locomotive's fuel tank, which holds approximately 5,000 gallons of fuel, had been filled in Amarillo the previous night. The locomotive had at least 2,000 gallons of fuel when it left Saginaw. There were three fuel gauges in the locomotive: one was a sight glass on the fuel tank itself, where the fuel level is gauged by looking at the fuel level in the tank; the second is an analog dial gauge on the tank itself, operating on a float and registering the fuel amount with a needle; and the third is a digital electronic gauge which displays the fuel amount on a computer screen on the console in the locomotive's cab. Rhodes testified that on previous trips he has had conductors check the tank fuel gauges while the train was in "operating mode."[4] The only way to do this is to lean over or under the railing and look down, as that is where the fuel gauges are located. According to the deposition testimony of Dana Maryott ("Maryott"), Appellee's director of locomotives, the digital gauges are the least reliable, though the analog gauges also fail with some regularity.

This specific locomotive is serviced through the Electromotive Division of General Motors. The locomotive is directed there every ninety-two days for scheduled maintenance. If a locomotive requires unscheduled maintenance, Appellee's manager of equipment operation questions the locomotive's crew to determine if there are any defects, which the manager then classifies on a scale ranging from level one (very major) to level nine (very minor). According to Maryott's deposition testimony, level nine defects are not addressed in regulations promulgated by either the Federal Railroad Administration ("FRA") or the Association of American Railroads.

---

[4] That is, while the train is in motion and running at less 20 M.P.H.

Maryott stated that level nine defects have no impact on a locomotive's ability to operate "safely and suitably," and need only be addressed when convenient for the Electromotive Division. In an "exception report" dated December 5, 2007, the locomotive was noted to have defective fuel gauges and display, which were listed as level nine defects. Maryott testified that in cases where there is a high demand for trains, "you will see locomotives released with minor defects back into service simply because we don't have the time for a minor defect that doesn't impact operation . . . ." Maryott testified that the gauges were not important enough to be tagged out-of-service. Appellant noted that Appellee places such tags on defective water coolers and toilets. Rhodes testified that the failure to place such a tag on the gauges is a violation of Appellee's policies, but also noted that he would not have immediately taken a locomotive out of service for such a problem.

Shortly after leaving the Saginaw yard, as the train was approaching the Trinity River bridge, the train went over an interlocker passage which was described as "rough." The yellow fuel pump light warning indicator on the computer display then indicated that there were zero gallons of fuel in the tank. Rhodes "made an exclamation," informed Appellant that "that couldn't be right," and after Appellant inquired, showed Appellant the gauges. Appellant and Rhodes discussed possible causes and the concern that the locomotive could be losing fuel and that they could not have used that much fuel (the fuel it had taken on in Amarillo). Rhodes commented "there's no way. Either we ripped the bottom out of the fuel tank, or it's just not reading right." Rhodes testified that there were two possibilities of what happened, one being a mechanical problem with the gauge, the other being that the fuel tank was ripped off or ripped open, which he felt "wasn't very likely," as he "could see back, and I didn't see fuel all over the

4

place." Rhodes asked Appellant whether he had checked the fuel gauges in Saginaw, but Appellant did not respond. At this point, Appellant left the cab on the engineer's side. Rhodes noticed this and assumed Appellant was leaving to check the gauges. Rhodes continued to operate the train, changing radio channels to inform a dispatcher that the train was approaching a tower. When Appellant did not return to the cab, Rhodes looked back in his mirror and did not see Appellant on the locomotive platform. A few minutes passed and when Appellant did not return, Rhodes stopped the train and went outside to look for him. As he exited through the same door Appellant had used, Rhodes noticed blood on the walkway. Rhodes radioed a dispatcher, advised that he did not know where Appellant was, told him that there was blood on the walkway and that he was in need of emergency assistance. Rhodes began searching for Appellant and eventually found him on the Trinity River Bridge, initially seeing him sitting up, then lying with his head next to the rail and his legs hanging off the bridge. Rhodes noticed Appellant had a severe injury to his head and rendered first aid until the paramedics arrived. There remains some dispute over the exact manner Appellant was injured. Following Appellant's injury, the gauges in the locomotive were repaired. As a result of his fall from the locomotive, Appellant suffered a broken neck, a closed-head injury, paralysis, memory loss, and severe pain and discomfort. Appellant commenced his lawsuit on January 12, 2009.

## DISCUSSION

Appellant presents one issue on appeal, specifically that the trial court erred in granting Appellee's traditional motion for summary judgment as to Appellant's LIA cause of action, when the trial court held that as a matter of law, the defective fuel gauge and in-cab display did not create an unnecessary risk of personal injury.

5

We review a grant of a traditional summary judgment *de novo*.  *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  We review the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002).  We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).  A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.  *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010), *cert. denied*, --U.S. --, 131 S.Ct. 1017, 178 L.Ed.2d 829 (2011); TEX.R.CIV.P. 166a(b), (c).

The LIA and FELA are interrelated federal statutory schemes.   When FELA cases are brought in state courts, federal law governs the substantive rights of the parties, while state rules govern procedural matters.  *See St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 1348, 84 L.Ed.2d 303 (1985); *Mitchell v. Missouri–Kansas–Texas R. Co.*, 786 S.W.2d 659, 661 (Tex. 1990); *Houghton v. Port Terminal R.R. Ass'n*, 999 S.W.2d 39, 43 (Tex.App.--Houston [14th Dist.] 1999, no pet.)(noting same).  Under FELA, railroad carriers are liable for damage to employees who suffer an injury "in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances . . . or other equipment."  45 U.S.C.A. § 51 (West 2012).

6

In comparison, the LIA provides that:

A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances--

>    (1) are in proper condition and safe to operate without unnecessary danger of personal injury;

>    (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

>    (3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C.A. § 20701 (West 2012).

FELA liability is premised on negligence by the railroad, however small, and allows for broader causes of action than the LIA. 45 U.S.C.A. § 51; *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508-9, 77 S.Ct. 443, 449-50, 1 L.Ed.2d 493 (1957); *CSX Transp., Inc. v. McBride*, -- U.S. --, 131 S.Ct. 2630, 2636, 180 L.Ed.2d 637 (2011). In comparison, the LIA imposes on the railroad the absolute duty to maintain the locomotive, its parts and appurtenances, in proper condition and without defects such that it is safe to operate without unnecessary peril to life or limb. *Lilly v. Grand Trunk Western Railroad Co.*, 317 U.S. 481, 485-86, 63 S.Ct. 347, 351, 87 L.Ed. 411 (1943).

A violation of the LIA may be shown in one of two ways. The carrier may breach its duty to keep all parts and appurtenances in proper condition and safe to operate without unnecessary peril, or, alternatively, the carrier may breach a more specific duty by failing to comply with regulations issued by the Federal Railroad Administration ("FRA"). *See McGinn v. Burlington N. R.R. Co.,* 102 F.3d 295, 299 (7th Cir.1996). The LIA (and its predecessor statute the BIA), are to be liberally construed to afford protection to railroad employees and others by using safe

7

equipment. *See Gregory v. Missouri Pacific R. Co.*, 32 F.3d 160, 161 (5th Cir. 1994). The LIA imposes an absolute and continuing duty on a railroad carrier to provide safe equipment. 49 U.S.C.A. § 20701; *Gregory*, 32 F.3d at 161. Under the LIA, it is not necessary to prove that violations of safety statutes constitute negligence. Proof that an employer violated the LIA is effective to show negligence as a matter of law. *Houghton*, 999 S.W.2d at 44, *citing Urie v. Thompson*, 337 U.S. 163, 189, 69 S.Ct. 1018, 1034, 93 L.Ed. 1282 (1949). Strict liability under FELA results when a rail carrier violates one of the Safety Appliance Acts,[5] which include the LIA. Thus, a railroad whose employees are injured as a result of the LIA will incur strict liability under FELA. *McGinn*, 103 F.3d at 298-99. If a railroad chooses to install a piece of equipment that is not required-because the equipment is not mandated by a federal regulation and does not constitute an integral or essential part of a locomotive-then the railroad must properly maintain that piece of equipment. If it fails to do so, and injury results, the railroad can be held liable for violating the LIA. *Giebel v. Union Pacific R. Co*., No. 08-CV-6294 (PJS/FLN), 2010 WL 1904921, *3 (D.Minn. May 11, 2010)(slip op.). In order to show a violation under the LIA, a plaintiff must show that the complained-of-condition created a safety hazard. *Glow v. Union Pacific R. Co.*, 652 F.Supp.2d 1135, 1143 (E.D. Ca. 2009), *citing Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 610 (9th Cir. 1993).

Appellant argues that the failure to keep the digital electronic fuel gauge and in-cab display in proper repair violated Appellee's general duty to keep all the appurtenances in a safe condition and its specific duty imposed by 49 C.F.R. § 229.45. This provision of the Code of Federal Regulations addresses the general condition of locomotive safety standards, requiring that:

All systems and components on a locomotive shall be free of conditions that

---

[5] 45 U.S.C.A. §§ 1-43 (West 2012).

endanger the safety of the crew, locomotive or train. These conditions include: insecure attachment of components, including third rail shoes or beams, traction motors and motor gear cases, and fuel tanks; fuel, oil, water, steam, and other leaks and accumulations of oil on electrical equipment that create a personal injury hazard; improper functioning of components, including slack adjusters, pantograph operating cylinders, circuit breakers, contactors, relays, switches, and fuses; and cracks, breaks, excessive wear and other structural infirmities of components, including quill drives, axles, gears, pinions, pantograph shoes and horns, third rail beams, traction motor gear cases, and fuel tanks.

49 C.F.R. § 229.45 (2012).

While this regulation lists a number of conditions, it is not intended to be exhaustive. *See Diede v. Burlington Northern R.R. Co.*, 772 F.2d 593, 595 (9th Cir. 1985). The railroad safety regulations, in a section on prohibited acts, provides that the LIA makes it unlawful for any carrier to use or permit any locomotive on its lines unless the "entire locomotive and its appurtenances" are: (1) in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life and limb; and (2) have been inspected and tested as required by the regulations. 49 C.F.R. § 229.7 (2012).

The LIA does not define "parts and appurtenances," leaving what is included in the definition to be determined on a case-by-case basis. We have been unable to find any cases which address defective or malfunctioning fuel gauges or in-cab displays in relation to either the LIA or FELA. Appellant argues that the fuel gauge and in-cab display are "appurtenances" of the locomotive. Appellee agrees, stating this is "a fact BNSF has never disputed" and "does not dispute that a digital fuel gauge constitutes an appurtenance." We agree.[6]

---

[6] *See Herold v. Burlington Northern, Inc.*, 761 F.2d 1241, 1246-47 (8th Cir. 1985)(holding that amber rotating beacon was a "part or appurtenance" in spite of the fact that no regulation required its installation); *Urie*, 337 U.S. at 179, 69 S.Ct. at 1029 (track sanders are within BIA); *Tiller v. Atlantic Coast Line Railroad Co.*, 323 U.S. 574, 577-78, 65 S.Ct. 421, 423, 89 L.Ed. 465 (1945)(headlight included under BIA); *Lilly*, 317 U.S. at 486-87, 63 S.Ct. at 351 (boiler spout is appurtenance under BIA); *Chicago, Rock Island & Pacific Railroad Co. v. Speth*, 404 F.2d 291, 293 (8th Cir. 1968)(explosive warning torpedoes, improperly placed on rack inside cab, are appurtenances under BIA); *Southern*

9

Appellant contends that Appellee breached both its specific duty under 49 C.F.R. § 229.45, and its general duty to maintain the parts and appurtenances of the locomotive.

The FRA provides guidance regarding railroad safety regulations. Chapter 8 of the Motive Power and Equipment Compliance Manual ("Manual") concerns "Railroad Locomotive Safety Standards" under 49 C.F.R. 229.[7] The Manual, in discussing 49 C.F.R. 229.45, states:

> Conditions described as fuel, oil, water, steam, and other leaks must be qualified by stating that they constitute a personal injury hazard. Insecure attachments of those items such as third rail shoes or beams, traction motors and motor gear cases and fuel tanks should have some relevancy to safety, or have deteriorated to the point that it is immediately unsafe and could cause an accident. A locomotive should not be cited for conditions described above if they do not constitute a hazard of any type, but are merely technical in nature. However, the railroad should be required to correct the condition and bring the locomotive into compliance. Any safety appliances not covered in Part 231, such as steps and handholds that aid in sanding locomotives, safety railings, and ladder treads affording access to the roof of the locomotive are covered by this section. Similarly, if the sander hose or pipe has a hole in it that discharges sand at eye level, the Inspector must establish the personal injury hazard under 229.45. The Inspector must explain how the blowing would cause the injury (e.g. sand blowing at eye level on locomotive walkway, etc.). [I]nspectors should use this code if or when they find a handle missing or the locking feature defective on locomotive air brake MU end-cocks, since these conditions may affect the operation of the locomotive's brakes.

Manual at Ch. 8 at 33-4.

This section of the Manual specifically provides that the "FRA also believes that, 'conditions that endanger the safety of the crew, locomotive, or train' provides the proper and

*Railway Co. v. Bryan*, 375 F.2d 155, 157 (5th Cir.), *cert. denied*, 389 U.S. 827, 88 S.Ct. 82, 19 L.Ed.2d 83 (1967)(metal lifting eye designed to assist locomotive getting back on track in event of derailment included under BIA); *Holfester v. Long Island Railroad Co.*, 360 F.2d 369, 372 (2d Cir. 1966)(fuse, fuse box, its contents, cover, latch and attachments included as appurtenances under BIA); *Fritts v. Toledo Terminal Railroad Co.*, 293 F.2d 361, 363-64 (6th Cir. 1961)(fireman's seat is an appurtenance under BIA); *Bolan v. Lehigh Valley Railroad*, 167 F.2d 934, 936-37 (2d Cir. 1948)(pilot step); *Hines v. Smith*, 275 F. 766, 767-68 (7th Cir. 1921)(automatic bell ringer is an appurtenance); *Green v. River Terminal Railway Co.*, 585 F.Supp. 1019, 1028 (N.D.Ohio 1984)(radio); *Zollinger v. Pittsburgh & Lake Erie Railroad Co.*, 337 F.Supp. 913, 913-14 (D.C.Pa. 1972)(push-pole is an appurtenance); *compare King v. S. Pac. Transp. Co.*, 855 F.2d 1485, 1488 (10th Cir. 1988)(armrests are not integral or essential); *McGinn*, 102 F.3d at 299 (luggage racks are neither integral nor essential).

[7] Found at http://www.fra.dot.gov/rrs/downloads/safety/Compliance%20Manuals/Chapter8Aug2012.pdf

lawful limit to the application of this section." *Id.* at 33. The Manual also gives guidance regarding 49 C.F.R. §§ 229.95 and 229.97, regulations concerning venting and grounding fuel tanks, which is instructive:

> There is no requirement for any type of fuel level gauge at the fuel oil reservoirs. Generally, all locomotives have fuel sight glasses of some type, but they are for the railroad's convenience, as is the automatic fuel shut-off equipment that is used when fueling locomotives.

Manual at Ch. 8 at 48.[8]

A review of the pertinent sections of the Code of Federal Regulations indicates that a defective fuel gauge, absent some malfunction or defect that would cause a condition in the gauge itself that could endanger the safety of the crew, would not violate the strict liability provision of 49 C.F.R. § 229.45. The guidance in the Manual notes that there is no violation of the statute if the conditions described in the regulation "do not constitute a hazard of any type, but are merely technical in nature. However, the railroad should be required to correct the condition and bring the locomotive into compliance." Manual at Ch. 8 at 34. Maryott testified that the worst consequence that could happen relating to a malfunctioning fuel gauge is that the train could run out of fuel and stop moving. In his deposition Appellant conceded this possible result. Appellant testified that Rhodes could have stopped the train and performed a physical inspection of the fuel tanks, and that such a process would take about fifteen minutes. Neither the Code of Federal Regulations nor the Manual provide specific mention of fuel gauges, or their maintenance. No evidence was presented that the malfunctioning fuel gauge itself presented a danger or was unreasonably dangerous or created an unnecessary risk of personal injury. We find that the trial

---

[8] We also note that the regulations are specific regarding certain gauges, including air pressure gauges (used as part of the brake system) and steam pressure gauges (when used on steam trains). However, there is no specific safety regulation relating to fuel gauges.

11

court did not err in holding that as a matter of law, a defective fuel gauge in and of itself, without evidence that the gauge defect itself is dangerous, does not violate the provisions of 49 C.F.R. § 229.45.

Appellant also contends that Appellee breached its general duty to maintain the parts and appurtenances in the locomotive. He argues that the fuel gauge indicated zero fuel in the tank shortly after traveling over a "rough" piece of track (or interlocker) despite sufficient fuel in the tank prior to departing the yard, and that an immediate investigation was required. Appellant argues that he left the cab in the course and scope of his duties, and was injured while leaning over the side to investigate the fuel gauge on the side of the tank. He also argues that the defective fuel gauge placed him in unnecessary danger because he had to go outside of the cab to check the fuel gauges on the tank to determine whether the train was actually out of fuel. An expert opinion prepared on behalf of Appellant concluded that the defective fuel gauge exposed Appellant to a risk of personal injury because: (1) the locomotive was not actually out of fuel; (2) the in-cab fuel display indicated a sudden loss of fuel because the fuel gauge was defective; (3) a properly functioning fuel gauge would not have caused the in-cab fuel gauge display to indicate a sudden loss of fuel; and (4) therefore, Appellant would not have exited the cab to investigate.

However, as Appellant acknowledges, a plaintiff attempting to prove a specific violation of a duty must prove more than that the part or appurtenance failed to work properly, but that the defect in the part or appurtenance presented "an unnecessary danger of personal injury." *See Glow*, 652 F.Supp.2d at 1143. As the Fifth Circuit noted in *Gregory*, the operation of a locomotive, no matter how equipped, involves some danger to life and limb and accordingly the LIA does not address all perils associated with operating locomotives, only the "unnecessary"

12

perils.  *Gregory*, 32 F.3d at 165.   Appellee cites *Varney v. Norfolk and Western Ry. Co.*, 899 F.Supp. 280 (S.D.W.Va. 1995) in support of its argument that it did not breach its general duty under the LIA.   The *Varney* court was concerned with an injury caused by a broken handle on a removable radio.   In that case, the court noted that conditions other than mechanical issues can render a locomotive or appurtenance unsafe to operate. However the court found that the broken strap on the radio handle did not render either the locomotive or the radio itself "unsafe to operate." *Varney*, 899 F.Supp. at 281-82.

Here, there is no evidence that the digital fuel gauge rendered the locomotive unsafe to operate "without unnecessary danger of personal injury."   *See* 49 U.S.C.A. § 20701.   Rhodes testified that a properly functioning fuel gauge, though necessary for the seamless operation of a locomotive, does not affect the safety of the crew.   There is no evidence supporting Appellant's claim that the defective fuel-gauge and in-cab display created an unnecessary danger of personal injury as a matter of law and we hold the trial court did not err so finding.

Having reviewed the evidence presented in the Motion for Summary Judgment in the light most favorable to Appellant, we find no error in the trial court's granting of summary judgment as to the LIA cause of action.   Appellant's sole issue is overruled.

## CONCLUSION

Having overruled Appellant's sole issue, we affirm the trial court's grant of summary judgment.


October 3, 2012

CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

13