HARDIMAN, Circuit Judge,
dissenting.
This is a field preemption case arising under the Locomotive Inspection Act (LIA). Just two years ago the Supreme Court had occasion to consider and clarify the LIA’s preemptive scope in Kurns v. Railroad Friction Products Corp., — U.S. -, 132 S.Ct. 1261, — L.Ed.2d - (2012). There, the Court held that state common law tort claims related to railroad safety are preempted by the LIA. This appeal requires us to decide whether the LIA’s broad preemptive scope extends to state law tort and breach of contract claims based on federal standards. The question defies an easy answer, but on balance, I read Kums to indicate that the LIA preempts all state law causes of action, even those based on federal standards of care. Accordingly, I respectfully dissent.
I
Our decision turns largely on how we read Kurns, which teaches that the LIA preempts a large swath of state law claims related to railroad safety (all those based on duties derived from state common law). Should we, in this case, take the next logical step on the path Kums has laid out and hold that the LIA preempts all state law claims related to railroad safety, regardless of whether those claims are based on state- or federal-law duties? Or should we depart from that path to carve out an exception for state common law claims based on federal standards?
I would take the next logical step and hold that the LIA preempts all state law claims in the field of railroad safety, including those at issue in this appeal, for three reasons. First, doing so is consistent with the LIA’s simple but important purpose — protecting railroad workers. Second, neither Kurns nor the case upon which it principally relies, (Napier v. Atlantic Coast Line Railroad, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926)), suggests that there is an exception to the LIA’s otherwise broad preemptive scope for state law causes of action based on federal standards of care. Finally, the majority’s decision to the contrary strips Kums of much of its practical significance while simultaneously threatening national uniformity in railroad law.
A
Congressional purpose suggests that state law causes of action based on federal locomotive safety standards are within the field preempted by the LIA. “[T]he prime purpose of the [LIA] was the protection of railroad employees and perhaps also of passengers and the public, at large from injury due to industrial accident.” Urie v. Thompson, 337 U.S. 163, 191, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (internal citation omitted). And whatever ancillary purposes the LIA is intended to serve, one thing is crystal clear: protecting railroads from lawsuits isn’t one of them. In fact, Congress intended to protect employees and other vulnerable parties from railroads and their potentially subpar safety measures. Thus, unlike my colleagues, see Maj. Typescript at 664, I’m neither surprised nor troubled by the notion that the *670 LIA would leave railroads like Canadian Pacific with no remedy for injuries such as those alleged here. And the absence of a remedy in no way reduces the incentives railroads have to ensure that their locomotives “are in proper condition and safe to operate,” and to closely inspect locomotive parts (like the defective seats that led to this case) for possible defects, see 49 U.S.C. § 20701 — in fact, it incentivizes railroads to be even more careful when inspecting their locomotives for safety hazards, since they cannot pass on LIA liability to others. That such increased safety would come at the expense of highly regulated railroads is no surprise, and should not influence our decision.[1]
In addition, Congress knew when it enacted the LIA (originally known as the Boiler Inspection Act) that the Federal Employers’ Liability Act (FELA), 45 U.S.C. § 51 et seq., provided a remedy for employees but not for railroads.[2] For over 90 years, Congress has not provided railroads a remedy for injuries they suffer as a result of LIA violations. That failure is unsurprising, consistent as it is with the LIA’s purpose — a purpose which is furthered by the role of FELA in providing a remedy to injured railroad workers.
Second, Kurns and Napier in no way suggest that the LIA’s broad preemptive scope includes a tacit exception for railroads to recoup FELA damages in state law causes of action based on federal standards of care. Instead, Napier held merely that the LIA “was intended to occupy the field,” citing the “broad scope of the authority conferred upon the [regulatory body charged with promulgating regulations under the LIA]” as evidence of that preemption. 272 U.S. at 613, 47 S.Ct. 207. And Kurns teaches that there is “no exception” in that preempted field for state standards of care. 132 S.Ct. at 1269. Neither case provides any reason to believe that a remedy lies outside of FELA for non-employees injured as a result of LIA violations.
Finally, I disagree with my colleagues that the primary goal of preemption — national uniformity — -would not be undermined by allowing state law causes of action using standards of care derived from the LIA. See Maj. Typescript at 666-67. Instead, I am convinced that allowing such causes of action would threaten uniformity significantly while at the same time undercutting the Court’s decision in Kums. To understand why, consider the text of the LIA, under which locomotives and locomotive parts and appurtenances must be “in proper condition and safe to operate without unnecessary danger of personal injury.” 49 U.S.C. § 20701(1). These requirements are amorphous, to say the least. What is “proper condition?” What is “safe to operate?” Whose “unnecessary danger of personal injury” is to be considered? The LIA does not answer these questions, and it would seem obvious that hundreds of state and federal courts will answer them in multifarious ways. And in doing so, they will undermine uniformity in the national regulatory scheme.
*671 A simple example illustrates the disparate results today’s decision will propagate: A person crossing a track is struck by a train through no fault of the train operator. No workers or passengers on the train are injured. The train is equipped with industry-standard braking equipment, but the injured person claims that a better brake design could and should have been used. The railroad is sued under a strict liability theory citing the LIA’s “proper condition and safe to operate without unnecessary danger of personal injury” language as the applicable standard that the railroad failed to meet. But does the injured person even have standing to sue under the LIA? A court deciding this question would turn to state law to determine whether only a worker or passenger of a railroad could sue under such a theory, and state law will often differ on this question.[3] Answering that question will affect the court’s interpretation of the LIA’s substantive standard of care, as it directly pertains to whose “unnecessary danger of personal injury” is relevant under the federal standard. Railroads will be subject to different rules in various states, and will have to adapt then-equipment and policies to each state’s decision regarding which parties could sue under the LIA. This is an untenable result.
These are the types of legal interpretations that state courts make every day in evaluating causes of action in various factual contexts. Negligence, for example, is a failure to “exercise reasonable care under all the circumstances.” Restatement (Third) of Torts: Physical. & Emotional Harm § 3 (2010). This standard, like the standard of care in the LIA, is general by design. To ascertain its meaning in a given context, trial courts consider a variety of factors, not the least of which may include “countervailing prineiple[s] or policies].” Id. at § 7. State- courts must and will construe the LIA’s required duties just as they normally would construe standards of care in other state law contexts— that is, by considering ordinary state policy concerns.
In doing so, state courts will necessarily inject state law policies into what is, according to the majority, an LIA-derived duty. This is exactly what Kurns prohibits. Kurns’s ban on state law standards of care is uncontroverted, yet actions based on those standards will implicitly be permitted under our decision today, which strips Kums of much (if not all) of its effect. It does so because the LIA’s federal standard of care is so broad that most state law claimants who would otherwise be barred by Kums will be able to avoid that bar by cloaking their state law claims in the garb of the LIA. Kums should not be gutted in this manner.[4]
*672 In sum, because the LIA protects workers and not railroads, because the Supreme Court has not so much as hinted at an exception for federal standards of care in the LIA’s broad preemptive scope, and because doing so would seriously undermine national uniformity, I would hold that the LIA preempts state law causes action falling within the preempted field, even when they are based on federal standards of care.
II
After giving short shrift to Kurns, a recent Supreme Court decision that arises under the LIA, the majority relies on older cases that arise under other federal laws. See Maj. Typescript at 662-64. Although these decisions have some relevance to this appeal, they involve laws that differ in meaningful ways from the LIA. Perhaps even more significant is the fact that they were decided before Kurns, so they are devoid of the Court’s reasoning in its most recent exposition of LIA preemption.
First, the majority leans on Abdullah v. American Airlines, Inc., 181 F.3d 363 (3d Cir.1999), and Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), for the proposition that “in other statutory contexts ... violations of federal law can be redressed through state common-law claims.” Maj. Typescript at 662. My colleagues are correct that in some contexts the Supreme Court has allowed violations of federal law to be redressed through state law causes of action. But there are critical differences between those contexts and the LIA, and Abdullah evinces a prominent difference. The law interpreted in that case, the Federal Aviation Act (FAA), preempted the field of aviation safety but also included a savings clause that explicitly preserved “other remedies provided by law,” including state law claims. Abdullah, 181 F.3d at 374-75. The LIA doesn’t have a savings clause. The majority suggests that the savings clause is unimportant , because Abdullah “stands for the larger premise ... that even when Congress has occupied a particular field, state-law claims to remedy federal violations are not necessarily preempted.” Maj. Typescript at 662-63 n. 7. But if state law claims were permissible in any event, why did the FAA include a savings clause? Because the savings clause does no work under this interpretation, the majority violates the canon against superfluity, see Clark v. Rameker, — U.S. -, 134 S.Ct. 2242, 2248, 189 L.Ed.2d 157 (2014); United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (citing Inhabitants of Montclair Twp. v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)). The better view is that the LIA’s lack of a savings clause is a meaningful difference between it and the FAA.
Silkwood involves the Atomic Energy Act, a federal law that, unlike the LIA, is not accompanied by a comprehensive federal remedial scheme. 464 U.S. at 241, 104 S.Ct. 615. As the majority recognizes, even in the absence of a savings clause in the Atomic Energy Act, Congress indicated that it assumed state tort remedies would remain available within the preempted field. As the Court noted, “there [was] no indication that Congress even seriously considered precluding the use of such remedies” in passing the law. Id. at 251, 104 S.Ct. 615. In contrast, the LIA evidences no desire by Congress to permit state law remedies to remain avail *673 able within the locomotive safety field. In fact, the existence of a federal remedial statute (FELA) is a strong indication that those remedies did not remain available. FELA provides a remedy for LIA violations just as state law claims did for the Atomic Energy Act. If there were a federal remedial statute like FELA for • the Atomic Energy Act, the Silkwood Court would have had no reason to find it “difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.” Silkwood, 464 U.S. at 251, 104 S.Ct. 615.
The Silkwood Court’s assumption that Congress would not leave persons injured by violations of the Atomic Energy Act without a remedy is consistent with that Act’s purpose of protecting the public from an emerging and potentially dangerous form of energy while at the same time promoting the development of the atomic energy industry. See 42 U.S.C. § 2012. It would make little sense to pass a law “in order to protect the public,” while depriving the public of a way to enforce that protection. Id. § 2012(i). Conversely, it makes perfect sense' that Congress did not intend to permit private actions in the particular context presented by this case: a railroad attempting to recover under the LIA. Unlike the Silkwood plaintiff (the administrator of the estate of an employee of an atomic energy company), a railroad like Canadian Pacific is outside the protective scope of the LIA. “[T]he prime purpose of the [LIA] was the protection of railroad employees.... ” Urie, 337 U.S. at 191, 69 S.Ct. 1018. FELA already provides a remedy for railroad employees who suffer injury as a result of LIA violations; thus, Congress could — and, in my view, did — foreclose state law causes of action based on LIA violations with nary a concern about leaving railroad workers without a remedy.
The cases dealing with the Safety Appliance Acts (Appliance Acts) —Crane v. Cedar Rapids & Iowa City Railway Co., 395 U.S. 164, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969); Breisch v. Central Railroad of New Jersey, 312 U.S. 484, 61 S.Ct. 662, 85 L.Ed. 964 (1941); and Tipton v. Atchison, Tulsa & Santa Fe Railway Co., 298 U.S. 141, 56 S.Ct. 715, 80 L.Ed. 1091 (1936)—are more germane to this appeal because there are some superficial similarities between the Appliance Acts and the LIA. As the majority points out, both the Appliance Acts and the LIA regulate locomotive equipment, and neither provides for private enforcement — instead, injured employees must seek a remedy under FELA, and there is no statutory remedy for non-employees. Maj. Typescript at 663. And, as with the LIA, the Appliance Acts preempt their field of regulation and Congress gave no explicit indication that state law causes of action should remain available under them, yet nonemployees may seek redress for violations of the Appliance Acts via common law causes of action. Crane, 395 U.S. at 166, 89 S.Ct. 1706.
But rote application of these precedents to this appeal overlooks the importance of the Supreme Court’s more recent and more relevant decision in Kurns. The effect of the Appliance Acts cases on the LIA is at least questionable after Kurns. Crane, decided 45 years ago, held that the defense of contributory negligence in an Appliance Act suit was not preempted. 395 U.S. at 167, 89 S.Ct. 1706. Contributory negligence, a standard feature of common law negligence actions, is defined by state common law. Yet Kurns prohibits the use of a state law standard of care in a case related to railroad safety. Kurns, 132 S.Ct. at 1269. Given the Court’s clear statement that state law has no place in defining duties in the field of railroad safety, I think it unlikely the Court would *674 permit a state standard of care to be used, as Crane allows, as part of an affirmative defense. Id. (noting that the “categorical conclusion” that the LIA preempts the field of locomotive safety “admits of no .exception for state common-law duties and standards of care”). In my view, then, if Crane retains vitality after Kums, it must be read to apply only to the Appliance Acts, and not to the LIA.
Breisch and Tipton, the other Appliance Acts cases cited by the majority, raise a similar concern. Both cases recognize that the Appliance Acts “leave the genesis and regulation of [rights of action based on breach of the Appliance Acts] to the law of the states.” Tipton, 298 U.S. at 148, 56 S.Ct. 715; accord Breisch, 312 U.S. at 486, 61 S.Ct. 662. As Tipton noted, the Appliance Acts created an “absolute duty” for employers — if employers fall below that statutory standard of care, they are negligent under state law. 298 U.S. at 146, 56 S.Ct. 715. But under Tipton, state law standards of care may still play a significant (and, under Kums, prohibited) role: although a railroad’s violation of the Appliance Acts means that it is negligent, a railroad’s compliance with the Appliance Acts does not mean that it is not negligent. See Restatement (Third) of Torts: Physical & Emotional Harm § 16 (2010) (“[Compliance with a pertinent statute, while evidence of non-negligence, does not preclude a finding that the actor is negligent ... for failing to adopt precautions in addition to those mandated by the statute.”). Thus, under Tipton and Breisch, a particularly safety-conscious state could hold railroads to a more stringent standard of care than that mandated in the Appliance Acts — a “potent method of governing conduct and controlling policy,” that Kums plainly precludes. Kurns, 132 S.Ct. at 1269 (quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). Here again, although the Appliance Acts and the LIA share some traits, Kums illustrates that cases construing the Appliance Acts do not necessarily apply in the LIA context.
Aside from the lack of a case analogous to Kurns that arises under the Appliance Acts, those Acts differ from the LIA in another critical way. As the majority acknowledges, the Appliance Acts contain some very specific requirements for railroads — “certain safety equipment [must] be used on railroad carriers, such as automatic couplers, efficient hand brakes, secure ladders with handholds or grab irons, and power brakes sufficient to stop the train.” Maj. Typescript at 663 n. 9 (citing 49 U.S.C. § 20302). The LIA, by contrast, merely requires that trains and their constituent parts be “in proper condition and safe to operate without unnecessary danger of personal injury.” The Appliance Acts’ veritable laundry list of requirements allows a court to decide a case based on them without referencé to common law, and with little interpretive discretion — either a train is equipped with the mandated parts, or it is not. The LIA’s broad scope, as I noted in Part I, offers no such clear guidance, and will require courts to give meaning to its general instructions. State courts will do so by filling in the gaps with multifarious'state policies and rules, contrary to the teaching of Kurns.
Ill
The LIA’s preemptive scope is broad— perhaps unusually broad, given recent Supreme Court preemption cases. See Kurns, 132 S.Ct. at 1270 (Kagan, J., concurring) (“Viewed through the lens of modern preemption law, Napier is an anachronism.”). But we must follow the law as it specifically pertains to the LIA, and Kums is the most germane pronounce *675 ment on the subject. I recognize that my view would leave Canadian Pacific, and other injured non-employees, without a remedy for LIA violations. “But it is for Congress to amend the statute to prevent such injustice. It is not permitted the Court to rewrite the statute.” Crane, 395 U.S. at 167, 89 S.Ct. 1706. The absence of a remedy under the LIA may be a tough pill for railroads to swallow, but it is the one I believe Congress prescribed. With respect, I dissent.

. The majority speculates that "[i]f Congress intended to foreclose all legal remedies available to railroad companies seeking to recoup FELA damages, it likely would have said so plainly.” Maj. Typescript at 665 n. 14. In light of the LIA's purpose, it is even more likely that if Congress did not intend for railroads to shoulder the entire LIA regulatory burden, it would have said so plainly.

. The. Boiler Inspection Act, which was passed after FELA, worked so closely with FELA that the Court called it "substantively if not in form [an] amendment ] to the Federal Employers’ Liability Act.” Urie, 337 U.S. at 189, 69 S.Ct. 1018.

. Some states follow the Third Restatement of Torts, which "does not limit a strict liability cause of action to the ‘user or consumer,’ and broadly permits any person harmed by a defective product to recover in strict liability.” Berrier v. Simplicity Mfg., Inc. 563 F.3d 38, 54 (3d Cir.2009) (noting that Wisconsin, California, Mississippi, Arizona, Missouri, Michigan, Iowa, Alabama, Utah, and Vermont do so). But other states have declined to adopt the Third Restatement, and might limit recovery only to a consumer or user of the product — in this case, a worker or passenger of the train. See, e.g., Tincher v. Omega Flex, Inc., — Pa. -, 104 A.3d 328, 399-400, 2014 WL 6474923, at *62 (Pa. Nov. 19, 2014) (declining to adopt the Third Restatement's approach to strict liability, despite the Third Circuit's prediction that it would do so in Berrier, 563 F.3d at 53).

. The majority correctly notes that state courts already interpret the LIA through FELA actions filed in state court. But that fact is immaterial to the question presented in this appeal because we all agree that Congress, by enacting FELA, has eschewed national uniformity in favor of providing a remedy to injured railroad workers who sue their employers. Kums demonstrates that this policy-based exception to national uniformity *672 does not extend even to cases in which railroad workers sue non-employers — let alone cases, like this one, in which railroads sue under the LIA.