**Trennon PUTNAM**

v.

**NORFOLK SOUTHERN RAILWAY COMPANY, INC.**

2140873.

Court of Civil Appeals of Alabama.

Jan. 15, 2016.

Certiorari Denied March 11, 2016 Alabama Supreme Court 1150434.

R. Willson Jenkins, Florence, for appellant.

Michael W. Ray, Turner B. Williams, and Al F. Teel of Burr & Forman, LLP, Birmingham; and Larry B. Moore of Moore, Berry & Linville, Florence, for appellee.

MOORE, Judge.

Trennon Putnam ("the employee") appeals from a summary judgment entered by the Colbert Circuit Court ("the trial court") on his claim against Norfolk Southern Railway Company, Inc. ("the employer").

### Procedural History

On December 16, 2009, the employee filed a complaint against the employer asserting a claim of negligence pursuant to the Federal Employers' Liability Act ("the FELA"), 45 U.S.C. §§ 51–60, based on the employer's alleged failure to provide the employee with a safe place to work; specifically, the employee alleged that he had suffered hearing loss as a result of his working conditions. The employer filed an answer on March 1, 2010. On September 5, 2014, the employer filed a motion for a summary judgment. The employee filed a response to the employer's summary-judgment motion on January 6, 2015. The employer filed a reply brief in support of its summary-judgment motion on January 9, 2015. On May 28, 2015, the trial court entered an order granting the employer's summary-judgment motion. The employee filed his notice of appeal to the Alabama Supreme Court on July 2, 2015, and, pursuant to § 12–2–7(6), Ala.Code 1975, that court subsequently transferred the appeal to this court.

### Facts

The employee testified in his deposition that, after he graduated from high school in 1985, he worked for Bevis Furniture from 1986 to 1990 and that, during his employment with Bevis Furniture, he had worked in the office the first two years and in the plant using a rivet press the latter two years. He stated that he wore earplugs when he worked at Bevis Furniture. The employee testified that he began

working for the employer on February 20, 1990, as a service attendant in the mechanical department of the Sheffield Yard in Alabama and that he continued to work in that position at the time of his deposition on September 24, 2010. According to the employee, his duties include fueling the locomotives; sanding the locomotives to provide traction; oiling the locomotives; watering the locomotives; changing brake shoes on the locomotives; "hostling" or handling or moving the locomotives between tracks; and supplying locomotive cabs. He testified that those duties are performed on a shop ramp in the Sheffield Yard. According to the employee, he works an eight-hour shift five days a week and that the amount of time per eight-hour shift that he is exposed to locomotive noise varies depending on how busy the Sheffield Yard is each day. The employee testified that a light day would entail working on approximately 10 locomotives, that a heavy day would involve working on approximately 18 to 22 locomotives, and that servicing a locomotive can take anywhere from 20 minutes to over an hour, depending on what shape the locomotive is in.

The employee stated that he services the locomotives while they are running to check for oil and water leaks and that, up until two years before his deposition, it had been the employer's practice to leave all the locomotives running even if they were not being serviced at the time, so there might have been up to 25 locomotives running at once. The employee stated that, in the two years before his deposition, the employer had begun shutting the locomotives off to save fuel. According to the employee, while performing his duties of servicing the locomotives, he is exposed to the engine noise, to "getting air pop off from the dry bones on [the locomotives]," to the "turbo," which is a high-pitched noise the locomotives make while idling,

and to the horn and the bell of the locomotives when the workers perform checks on those mechanisms. He testified also that, in order to service the locomotives, he is required to "blow oil up" in the air-compressor room where the oil tank is located once or twice per shift, that that takes approximately 10 minutes each time, and that that area is also very noisy. The employee stated that, on days when there are fewer than 10 locomotives to service, he cleans up and stocks materials, during which time he also eats lunch. He stated that his other duties include cleaning up, unloading fuel cars, and maintaining the stockroom. According to the employee, the amount of time that he is exposed to locomotive noise varies depending on how busy he is each day.

According to the employee, when he began working for the employer, he had to submit to a physical examination, which resulted in the production of an audiogram, which is a written record of the results of a hearing test that was performed on him. He testified that he had submitted to annual hearing tests during his employment with the employer. The employee stated that he had been provided "[a]n assortment of different styles of earplugs" by the employer and that, in 2008, two years before his deposition, the employer had begun providing "earmuffs," which, he said, were his preferred hearing protection. He testified that he could not remember whether earplugs had been required when he first began working for the employer, but, he said, he had worn earplugs for as long as he could remember. Although he stated that he had never complained to anyone in management about the type of hearing protection that he had been provided during the time he had worked for the employer, he also stated that he had asked for a different type of hearing protection to wear when he was

working around the locomotives during fueling and oiling. According to the employee, he was typically given his hearing test before the start of his shift and that that routine, as well as the way the hearing test was administered and the way informational videos were provided to him, had not changed since the beginning of his employment with the employer.

The employee testified that he and his family had restored classic automobiles and that his father had had a torch, a welder, and a grinder in his shop where they worked on the cars. The employee testified further that he had worn earplugs when he had worked in the shop with his father in the past, but, he stated, he now buys cars that have already been restored. He testified that he had attended car races when he was younger because his brother and his brother's son race stock cars, but, he said, he had attended very few races as an adult. The employee stated that he had worn earplugs when he had attended those races. The employee also testified that he had driven motorcycles from 2002 to 2009.

Mark Dudle testified that he began working for the employer in 1992 as an assistant manager for industrial hygiene, that he had since been promoted twice, and that, at the time of his deposition on August 9, 2013, he was the manager for industrial hygiene and safety reporting. The employer presented as an exhibit to its summary-judgment motion a copy of the policies relating to its hearing-conservation program, which had been issued in September 1985, and the revision thereto. Dudle stated that the goal of the hearing-conservation program is to protect the hearing health of the employer's workers and that the employer's hearing-conservation program includes workers who are exposed to noise above 85 decibels for an 8-hour time-weighted average. He testi-

fied that, according to the Occupational Safety and Health Administration ("OSHA"), 85 decibels is the level at which the employer is required to implement a hearing-conservation program for its workers that are exposed to noise at that level or above.

According to Dudle, if a worker is losing his or her hearing from occupational-noise exposure, the employer should continue to include that worker in the hearing-conservation program, which requires annual audiometric testing and training of the worker and notifying the worker of the test results. Dudle testified that the standard method of audiometric testing is to administer the test to a worker without the worker wearing a hearing-protection device. He stated that manufacturers of hearing-protection devices assign a noise-reduction rating to their hearing-protection devices and that the higher the noise-reduction rating, the more attenuation that device provides. Dudle testified that it is not the employer's responsibility to say whether the noise-reduction rating displayed on the packaging of a hearing-protection device is accurate.

In a letter dated April 4, 2013, from Larry Liukonen, the employer's expert witness and an industrial hygienist, to the employer's attorney, Liukonen stated that, on February 15, 2013, he had visited the Sheffield Yard and conducted tests on the employee's noise exposure and that the tests he had conducted were concurrent with testing that had been performed by Paul E. Saywell, Jr., the employee's expert witness, who is also an industrial hygienist. Liukonen stated that, during the testing, the employee had simulated the loudest portions of his job. In his letter, Liukonen concluded, among other things, that the employee's noise exposure was within OSHA allowable limits and that, as a result, participation in a hearing-conserva-

tion program was not necessary and hearing protection was not required for the employee.

Liukonen testified at his deposition on August 12, 2014, that he had been to "very, very many service tracks" since 1979 and that he had "tested very many service attendants" and had "reviewed testing of other people who've tested service attendants," and, he concluded, "service attendants at service tracks don't have excessive noise exposure." Liukonen stated that the use of hearing protection is a last resort to control noise exposure. He testified that "engineer[ing] out the noise" is the best way to control noise exposure and that sometimes noise exposure can be controlled by using administrative controls, but, he said, using hearing protection is not a desired form of noise control because nobody likes to wear protective equipment and protective equipment is not as effective as "engineering out the noise" because a worker will still receive some noise exposure if he or she enters a loud area without protection.

Saywell, the employee's expert, testified that, if he had performed an entire day of noise testing with the employee and the time-weighted average sound level ("TWA") was 85 decibels or below, he would not have any concerns if the employee was wearing hearing protection. He stated, however, that all the measurements he had taken at Sheffield Yard had been above 85 decibels. Saywell testified that his inspection at the Sheffield Yard had revealed that, under OSHA guidelines, the TWA the employee was exposed to was 90.8 decibels and that, under the standards set by the American Conference of Governmental Industrial Hygienists, which do not have the force of a legal regulation or law but are issued by a national consensus group for industrial-hygiene standards, the TWA the employee was exposed to was 94.3 decibels. According to Saywell, he concluded that the employee's noise-induced hearing loss is a result of his occupation with the employer because, he said, after reviewing the employee's medical records and considering the employee's denial of other noise exposure, he had found nothing else that could have caused the hearing loss.

Dr. John Emmett, a hearing specialist, testified that he had first seen the employee on August 19, 2008, and that, on that visit, the employee had reported that he had been experiencing ringing in his ears, known as tinnitus, and dizziness when he would lie down or sit up from a lying position. Dr. Emmett testified that, at that time, testing had revealed that the employee had experienced some hearing loss at higher frequencies in both ears, but more in his left ear; that, considering the employee's age, the employee's audiogram had been very consistent with noise-induced hearing loss; and that, based on the audiogram and the employee's answers to certain questions, he had determined that the employee had a sensorineural hearing loss with tinnitus that was secondary to noise trauma. In a letter dated August 21, 2008, to Dr. Terrance Hart, who had referred the employee to Dr. Emmett, Dr. Emmett stated that the employee "has a moderate high frequency sensorineural hearing loss in each ear" and that, in his opinion, the employee's hearing loss is the result of past noise exposure.

Dr. Emmett described the effect of noise exposure on the ears as being comparable to the effect of walking on grass. He stated that, if you walk across your yard in the same place time and time again, there will be a dirt path with no grass and that, similarly, with noise exposure, after being exposed to noise for a long period, there would be no hair cells in the ears. He testified that an earmuff provides a more

complete protection of the cochlea in the ear than an earplug does. He stated that, typically, noise exposure causes bilateral hearing loss, which is what the employee has experienced. Dr. Emmett testified that the noise to which the employee had been exposed from race cars, tools such as grinders, and riding motorcycles could have contributed to his hearing loss. He stated that, in order to make a diagnosis of occupational-noise exposure to a reasonable degree of medical certainty, he would need to have more information about the additional noise levels the employee had been exposed to, although, he stated, that information is generally not available to doctors or to the patient.

### Standard of Review

Our standard of review in this case was outlined in *Pulley v. Norfolk Southern Railway*, 821 So.2d 1008, 1011–12 (Ala.Civ. App.2001):

"A party is entitled to a summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. 'Our standard of review in cases involving summary judgments is de novo.' *Lee v. Burdette*, 715 So.2d 804, 806 (Ala.Civ.App.1998). 'In reviewing the disposition of a motion for [a] summary judgment, we utilize the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact' and whether the movant 'is entitled to a judgment as a matter of law.' *Bussey v. John Deere Co.*, 531 So.2d 860, 862 (Ala.1988); Rule 56(c)(3), Ala. R. Civ. P. '[I]f the moving party makes a prima facie showing that no genuine issue of material fact exists, then the burden ... shifts to the non-movant; ... the non-movant must show "substantial evidence" in support of his position.' *Bass v. SouthTrust Bank of*

*Baldwin County*, 538 So.2d 794, 798 (Ala.1989). Evidence is 'substantial' if it is 'of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' *West v. Founders Life Assurance Co. of Florida*, 547 So.2d 870, 871 (Ala.1989). Our review is further subject to the caveat that this court must review the record in a light that is most favorable to the nonmovant and must resolve all reasonable doubts against the movant. *Hanners v. Balfour Guthrie, Inc.*, 564 So.2d 412, 413 (Ala.1990)."

### Discussion

The employee argues on appeal that the trial court erred in entering a summary judgment in favor of the employer. Section 51 of the FELA provides, in pertinent part, that

"[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

"In any negligence case, the plaintiff bears the burden of proving the existence of a duty owed by the defendant, a breach of that duty, causation, and damage." *Glass v. Birmingham Southern R.R.*, 905 So.2d 789, 794 (Ala.2004). "Under the FELA, a railroad employer owes its employees a duty to provide a safe place to work." *Id.* The employer argues that the trial court did not err in entering the summary judgment in its favor because, it says, the employee did not present substantial evidence of a breach by the employer of its

duty to provide the employee a safe place to work; the employee did not establish that his injury was foreseeable to the employer, which is an essential element of any FELA claim, *see Carlew v. Burlington Northern R.R.*, 514 So.2d 899, 901 (Ala. 1987); and the employee failed to meet his burden as to evidence of causation. We address each of those arguments by the employer in turn.

■ First, the employer argued in its summary-judgment motion that "no breach of duty can be proven" in the present case. With regard to whether there has been a breach of duty pursuant to a negligence claim under the FELA, our supreme court has stated:

> "Numerous factors must often be accounted for in determining whether a defendant has breached its duty of care to a plaintiff. As the United States Supreme Court has noted in a FELA case,
>
> > " 'The debatable quality of that issue, the fact that fair-minded men might reach different conclusions, emphasize the appropriateness of leaving the question to the jury. The jury is the tribunal under our legal system to decide that type of issue.... To withdraw such a question from the jury is to usurp its functions.'
>
> "*Bailey* [*v. Central Vermont Ry.*], 319 U.S. [350] at 353–54, 63 S.Ct. 1062 [ (1943) ]. For this reason, only when 'one would have to infer from no evidence at all' that the defendant breached its duty can a court take the question from the jury and enter a judgment as a matter of law for the defendant. *Moore v. Chesapeake & Ohio Ry.*, 340 U.S. 573, 577, 71 S.Ct. 428, 95 L.Ed. 547 (1951)."

*Glass*, 905 So.2d at 795. Thus, we must determine whether there was any evidence at all from which a jury could conclude that the employer had breached its duty to the employee to provide a safe place to work.

This court stated in *Sweeney v. CSX Transportation, Inc.*, 735 So.2d 472, 475 (Ala.Civ.App.1998), that

> "[w]hat constitutes negligence in a FELA action is governed by federal law and does not vary according to state law. *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); *Southern Ry. v. Roberts*, 380 So.2d 774 (Ala. 1979), *overruled on other grounds by Tidball v. Orkin Exterminating Co.*, 583 So.2d 239 (Ala.1991). 'The "slight negligence" necessary to support an FELA action is defined as a failure to exercise great care and that burden of proof is much less than the burden required to sustain recovery in ordinary negligence actions.' *Roberts*, 380 So.2d at 776."

We note that, "[w]hile the FELA is to be construed liberally, it is not a workers' compensation statute, [*Consolidated Rail Corp. v.] Gottshall*, 512 U.S. [532] at 543, 114 S.Ct. 2396 [ (1994) ], nor does the FELA render an employer an insurer of the safety of its employees." *Glass*, 905 So.2d at 793.

In the present case, the employer argues that the employee cannot show a breach of duty on the part of the employer because, it says, the undisputed evidence shows that the employer's hearing-conservation program was in place the entirety of the employee's career, that the hearing-conservation program complied with applicable requirements of OSHA, that the employee had received annual tests and audiograms throughout his employment with the employer, and that the employer had provided an assortment of hearing protection to the employee throughout his employment with the employer.

OSHA requires the administration of a hearing-conservation-and-monitoring program whenever a worker's noise exposures equal or exceed an 8–hour TWA of 85 decibels. 29 C.F.R. § 1910.95(c)(1). Among other things, OSHA requires that, if a comparison of an annual audiogram to a baseline audiogram indicates a standard threshold shift, the worker shall be informed of that fact in writing. 29 C.F.R. § 1910.95(g)(8)(i). A "standard threshold shift" is defined in the employer's hearing-conservation-program manual as "[a] change in the hearing threshold relative to the baseline audiogram averaging of 10 dB or more at 2000, 3000, and 4000 Hz in either ear." The employer's hearing-conservation program requires the employer's medical department to not only conduct annual hearing tests on the employer's workers, but also to identify threshold shifts and other audiological problems, to notify a worker of the results of his or her hearing tests, and to refer a worker to a specialist as required. The employer's hearing-conservation program, as revised in January 2009, further requires that, if a standard threshold shift is indicated in the results of a worker's annual testing, the worker "shall be refitted and retrained in the use of hearing protection, and will be provided with hearing protectors offering greater attenuation if necessary."

■ The employer asserts that courts routinely look to OSHA's guidelines for guidance as to whether an employer is in compliance with the standard of care and that, because the employer complied with OSHA's guidelines, it fulfilled the requisite standard of care. The employer cites a number of cases from federal courts in support of its arguments; we note, however, that not all the federal decisions addressing this matter constitute controlling authority, and we defer only to the holdings of the United States Supreme Court and interpretations of the federal law by this court and our supreme court. *Glass,* 905 So.2d at 794. "Legal principles and holdings from inferior federal courts have no controlling effect [on Alabama's appellate courts], although they can serve as persuasive authority." *Id.* The employer cites two Alabama cases—*McSween v. Michelin Tire Corp.,* 698 So.2d 146 (Ala. Civ.App.1997), and *Singleterry v. ABC Rail Products Corp.,* 716 So.2d 1241 (Ala. Civ.App.1998)—in support of its argument; however, those cases were based on workers-compensation claims, which are to be construed differently than the FELA claim at issue in the present case. *See Gottshall, supra.* Even if we concede that OSHA's guidelines provide some guidance as to the standard of reasonable care, the employer's compliance with those guidelines alone does not require affirmance of the summary judgment entered in the present case. In *Urie v. Thompson,* 337 U.S. 163, 178, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), the United States Supreme Court observed that "negligence, within the meaning of the [FELA], attached if [the employer] 'knew, or by the exercise of due care should have known,' that prevalent standards of conduct were inadequate to protect [the employee] and similarly situated employees."

The employer cites the deposition testimony of Saywell and Dr. Emmett indicating that they both consider compliance with OSHA's guidelines to be safe and reasonable. Dr. Emmett testified that he is aware that OSHA's guidelines do not require a worker to wear hearing protection when the worker is exposed to a TWA of less than 90 decibels and that, because those guidelines are from OSHA, he would consider that to be safe and reasonable standards. Dr. Emmett also stated that, if an employer complies with those guidelines, he would expect that conduct to be safe and reasonable. He testified that he

would agree that he would not reasonably expect a worker to have hearing problems if the noise to which the worker is exposed is a TWA of less than 85 to 90 decibels, the worker wears hearing protection, and the worker wears the hearing protection correctly. He also testified that, even without hearing protection, he would not expect a worker to have "any significant issues" if the noise to which the worker is exposed is a TWA of less than 85 to 90 decibels. Although he admitted that certain information, including information regarding the employee's job duties and his level and length of noise exposure on the job, would be required to make a "definitive opinion to a reasonable degree of medical certainty" regarding whether the employee's hearing loss was related to occupational-noise exposure, Dr. Emmett declined to retract his previous testimony indicating that he had not uncovered any factors, other than possible occupational-noise exposure, contributing to the employee's hearing loss.

Although Saywell testified that compliance with OSHA's guidelines would be considered reasonable on the part of an industry, he also testified that compliance with OSHA guidelines does not necessarily mean that a worker will not experience noise-induced hearing loss. Additionally, Saywell testified that OSHA's guidelines are bare minimum standards that do not protect everybody from hearing loss. He stated that meeting the minimum guidelines set by OSHA allows an employer to comply with the law but that, to prevent hearing loss, an employer might have to go beyond those minimum guidelines. Saywell testified that the employer in this case had done nothing to make sure that the hearing-protection devices it had supplied to the employee fit or that the devices were reducing the employee's exposure to noise. He stated that there had been no testing performed by the employer to as-

certain whether the noise to which the employee was exposed had been lessened by the hearing-protection devices it had supplied. According to Saywell, the employee had first showed the potential for occupational, noise-induced hearing loss at a high frequency in 1998, and, he said, he had seen nothing to indicate that the employer had tried to find the source of the employee's hearing loss, that the employer had monitored the employee's job for noise, or that the employer had sent the employee to a specialist until much later. Saywell also submitted a time line as an exhibit to his deposition that indicated that the first standard threshold shift in the employee's hearing had occurred in 1993, but that shift had later normalized, and that other shifts in the standard threshold had occurred in 1993, 2003, 2007, and 2008. The employee first visited Dr. Emmett, however, in 2008. Dudle's testimony confirmed that, to his knowledge, there had been no noise-exposure testing for service attendants at the Sheffield Yard but that the employer had done representative monitoring of service attendants at other of its facilities. Dudle also testified that the employer had not considered using custom-molded earplugs that are fitted to a worker's ears. In light of Saywell's testimony, assuming that the employer made a prima facie showing that it had complied with the guidelines outlined by OSHA, we cannot conclude that that compliance supports the trial court's summary judgment in favor of the employer.

The employer further asserts that there were "issues" with Saywell's inspection and testing efforts at the Sheffield Yard and that the employee testified in his deposition that there were periods of inactivity during his workday that would not expose him to noise. Liukonen testified that Saywell had overstated the noise exposure present at the Sheffield Yard because, he

said, Saywell did not know what a service attendant's job responsibilities include and Saywell had tested what the employee had presented as the noisiest parts of his day and had assumed that those activities made up the majority of the employee's day, which, Liukonen stated, had affected the TWA. Liukonen also stated that Saywell had rented the dosimeter he had used in his testing, that Saywell was unfamiliar with noise dosimetry, and that the windscreen was off the dosimeter when Saywell had done his testing, which could have caused false noise. Although Liukonen admitted that he did not know whether it had been windy on the day that Saywell had performed his testing, he stated that it was good practice to put a windscreen on the microphone of the dosimeter. Liukonen testified that he had spoken to a couple of general foremen at the Sheffield Yard, whose names he could not recall, and that they had said that the service attendant is not present during the load tests, which Saywell had measured. He also testified that those foremen had told him that the employee had asked the electrician to run the load test a little longer while Saywell was performing the testing. The employee stated in his affidavit, however, that, on the day the employer had allowed the noise testing to be conducted at the Sheffield Yard, there had been only 1 locomotive engine running initially but that 2 additional locomotive engines had subsequently been turned on while he, Saywell, and Liukonen were present; however, according to the employee, on a normal workday, there are 10 to 20 locomotive engines running and the noise is much louder than it had been on the day the noise testing was conducted. Liukonen testified that, when 3 locomotives were running, the TWA had been 82 decibels. Considering the employee's testimony that there were typically more than three times the number of locomotive engines running

than had been running on the day of the testing, a jury could infer that the employee's noise exposure was greater than Liukonen's test results revealed.

The employer also notes that Liukonen testified that his testing at the Sheffield Yard had revealed an average noise-exposure level of 85.6 dBA during the testing and that that calculation was reached without factoring in quieter activities during the employee's workday. We note, however, that the employee testified that his time working in the noisier areas of the Sheffield Yard varied each day depending on the number of locomotives that had to be serviced. Also, the employee testified that he would often take his lunch break at the same time quieter activities were being performed; thus, a jury could infer that those quieter activities are performed during a lunch period and are not included in a typical eight-hour workday. The employer argues that the above evidence "clearly demonstrates that the alleged noise exposure of [the employee] was safe and reasonable." It is clear, however, that, based on the discrepancies in the results of the testing performed by Saywell and Liukonen and the employee's deposition and affidavit testimony, there remains a genuine issue of material fact regarding the noise level at the Sheffield Yard.

The employer also asserts that it provided the employee with "reasonably safe" hearing protection throughout the employee's employment. The employer argues that it reasonably relied on the manufacturer's noise-reduction ratings that were displayed on the packaging of the hearing-protection devices it had provided to its workers and that it had properly applied the OSHA attenuation factor, which indicates that noise-reduction ratings as listed on hearing-protection devices should be adjusted for a more accurate understand-

ing of the attenuation those devices provide. Although Dudle testified that it is not the employer's responsibility to say whether the noise-reduction ratings displayed on the packaging of hearing-protection devices are accurate, Saywell testified that those ratings are unreliable. Regardless, in light of Saywell's testimony that the employer had never conducted testing to confirm that the hearing-protection devices it had provided to the employee fit properly or actually reduced the employee's exposure to noise, in addition to the discrepancies regarding the actual noise level at the Sheffield Yard and the potential unreliability of the noise-reduction ratings displayed on the packaging of the hearing-protection devices the employer provided to the employee, we conclude that there remains a genuine issue of material fact regarding whether the employer provided reasonably safe hearing protection to the employee.

We agree with the employer's assertion that "reasonable care" does not require the employer to provide the employee with a 100% injury-free workplace.

> "A railroad company is not the insurer of the safety of its employees, and the FELA requires only that a railroad employer exercise reasonable care commensurate with the danger to be anticipated. *Atlantic Coast Line R.R. v. Dixon*, 189 F.2d 525 (5th Cir.), cert. denied, 342 U.S. 830, 72 S.Ct. 54, 96 L.Ed. 628 (1951)."

*Carlew*, 514 So.2d at 901. As discussed above, however, there remains a genuine issue of material fact whether the employer exercised reasonable care and, thus, breached its duty to provide a safe workplace in the present case.

█ The employer next argues that the employee cannot establish the element of foreseeability. In *Carlew*, our supreme court stated, in pertinent part:

> "Reasonable foreseeability is an essential element under the FELA. *Gallick [v. Baltimore & Ohio R.R.*, 372 U.S. 108 (1963) ].
>
> "The test is whether reasonable or ordinary care has been exercised by the employer with regard to the attendant circumstances of the employment that could reasonably have been anticipated by a prudent man. *Southern Ry. v. Bell*, 114 F.2d 341 (4th Cir.1940)."

514 So.2d at 901. In *Pulley v. Norfolk Southern Railway*, 821 So.2d 1008, this court stated the following with regard to the element of foreseeability:

> "Under the courts' broad interpretation of 'foreseeability of harm' in FELA actions, the foreseeability of the specific harm resulting from the negligence is not required. It is sufficient if the employer could foresee general harm resulting from a certain negligent practice. *Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)."

821 So.2d at 1013–14. Saywell admitted that one would not expect hearing loss based on noise exposure that falls within OSHA's guidelines; however, that statement cannot be considered in a vacuum. Viewing the record in the light most favorable to the employee, as we must, *see Pulley, supra*, we conclude that a jury could determine that the employer's failure to send the employee to a hearing specialist earlier in his employment with the employer, its failure to fit the employee with hearing protection and/or to test the effectiveness of the hearing protection it provided to the employee, or its failure to retrain the employee in the use of the hearing protection it provided amounted to a breach of its duty to provide a safe workplace to the employee. Additionally, a jury could conclude that the employee's hearing loss resulted from the employer's

negligent practices and that that loss was foreseeable, particularly in light of the continuing standard threshold shifts in the employee's annual audiograms.

[4] The employer last argued in its summary-judgment motion, and argues again on appeal, that the employee failed to provide evidence of causation. In support of its argument, the employer cites federal cases that have no binding effect on this court. *See Glass, supra.* Regardless, those cases, both of which involved injuries resulting from exposure to chemicals or other particulates, have no bearing on the present case. "In order to establish liability under the FELA, .... there must be sufficient evidence from which the jury could reasonably infer that the employer's negligence was the cause of the claimed injury or death." *Carlew,* 514 So.2d at 901. "The FELA imposes liability upon railroad employers if the railroad's negligence played any part, even the slightest, in an employee's injury." *Fox v. CSX Transp., Inc.,* 630 So.2d 432, 433 (Ala. 1993).

The employee stated in both his affidavit and his deposition testimony that he had been given a hearing test before he began his employment with the employer and that his hearing was normal at that time. The employer argues that "experts, like Dr. Emmett, must substantiate his opinion, and not simply provide the ultimate conclusion without any analysis." We note, however, that Dr. Emmett did provide analysis in support of his opinion; he noted that the employee's hearing loss was consistent with a noise-induced hearing loss. Although Dr. Emmett testified that other noises that the employee had been exposed to could have caused or contributed to his hearing loss, Dr. Emmett's testimony that hearing loss occurs as a result of exposure over time could indicate that the employee's exposure to noise at the Sheffield Yard had also contributed to his hearing loss. The employee stated in his affidavit that his job with the employer involves exposure to "extremely loud" noises and that, to communicate with fellow workers, they must yell at each other all the time. Given that testimony, we conclude that there was sufficient evidence presented from which a jury could infer that the employer's negligence played a part in the employee's hearing loss.

Viewing the record in a light that is most favorable to the employee, *see Pulley, supra,* we conclude that the employee presented substantial evidence of each of the elements of a negligence claim pursuant to the FELA such that entry of a summary judgment in favor of the employer was inappropriate. We therefore reverse the trial court's judgment and remand the case to the trial court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.